**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Charles GOSS and George C. Benson, Defendants-Appellants.**

No. 80–1285.

United States Court of Appeals, Fifth Circuit.
Unit A

July 6, 1981.

---

Robert Glass, New Orleans, La., Charles Brandt, Lafayette, La., for defendant-appellant Goss.

Robert McBride, Lafayette, La., for defendant-appellant Benson.

Anna E. Stool, Asst. U. S. Atty., Houston, Tex., Richard Sauber, Washington, D.C., for plaintiff-appellee.

Before RUBIN and GARZA, Circuit Judges, and SUTTLE *, District Judge.

ALVIN B. RUBIN, Circuit Judge:

George C. Benson, a former employee of Western Crude Oil, Inc., and Charles Goss, who was part owner of Ball Marketing Enterprise, were indicted on twenty-four separate counts of mail fraud, 18 U.S.C. § 1341, and one count of conspiracy to commit mail fraud, 18 U.S.C. § 371. Convicted on all twenty-five counts,[1] each appeals his conviction on a number of grounds. The major attack is on the sufficiency of the evidence, and we conclude that there was adequate basis in the record for the verdict. Because, however, we find that the trial judge erroneously refused to give the substance of one jury instruction requested by the defendants and, over the defendants' objection, gave an inadequate jury charge regarding another issue, we reverse the judgment of conviction and remand for a new trial. We also address other issues that will

---

* District Judge of the Western District of Texas, sitting by designation.

1. Each defendant was sentenced to serve six months on each count, all sentences to run concurrently. In addition the court imposed a total fine of $34,000 on each defendant, the maximum fine of $1,000 on each of the first twenty-four counts and the maximum fine of $10,000 on the twenty-fifth count.

likely arise in the context of the new trial in this case.

## I. FACTS

George Benson was an employee of Western in charge of crude oil purchasing in south Louisiana. Charles Goss was a buyer and reseller of crude oil. In December, 1974, Benson attempted to obtain crude oil for Western from Goss's company, Ball Marketing. Goss had once sold petroleum to Western but had become dissatisfied with that arrangement and, therefore, had previously terminated his business dealings with that company. However, after his discussion with Benson, Goss agreed to resume his dealings with Western. Thereafter, Ball Marketing began to sell to Western a petroleum product that was identified as crude oil.

The price of crude oil was then controlled and the supply was less than the demand. There were, therefore, more buyers in the market who were ready and willing to purchase crude oil than the sellers could satisfy with the available supply. Nevertheless, Goss began to mail checks drawn on Ball Marketing's account to Benson beginning in February, 1975, and continuing until February 1976. During this period Goss paid Benson $58,445.32 with sixteen separate checks. Other sums were paid to Benson not listed in specific counts in the indictment making the total payments to him through October, 1976, approximately $162,000.

Beginning in May, 1975, and continuing until December, 1975, Goss mailed eight invoices from Louisiana to Western's office in Texas, billing Western for a product described as crude oil. The product actually delivered was not crude oil but consisted mainly of the residuum left after crude oil had been processed in a fractionation unit at Egan, Louisiana. Goss's employees transported this residuum by truck to a storage tank where it was mixed with either diesel fuel or kerosene to give it the appearance of crude oil, and then delivered it to Western. The residuum could be picked up at the Egan facility, mixed with the diesel fuel or kerosene and delivered to Western in the course of one day. Goss purchased the residuum at $6.20 a barrel and resold the mix to Western for prices ranging from $12.25 to $13.45 per barrel. About 29,000 barrels of this mixture were sold as crude oil.

If crude oil is processed by fractionation, it will yield a number of petroleum products, some of greater value and some of lesser. It will, for example, yield gasoline, naphtha, kerosene and diesel fuel. The portion not drawn off in the form of one of these more valuable products is residuum, the part with the highest specific gravity, the least A.P.I. (American Petroleum Institute) gravity and the highest boiling point. If, however, a mixture of residuum and diesel fuel or a mixture of residuum and kerosene is processed, a fractionation unit simply breaks the mixture down into its original components. It separates the residuum from the diesel fuel or kerosene and yields the same amounts of each of the two products that were put into the mixture originally. No gasoline, naphtha or other higher priced products will be obtained. While the specific gravity and composition of the residuum left from the fractionation process varies depending on the kind and quality of the crude oil or condensate originally processed, running the residuum again through the fractionation procedure results in nothing but residuum. Residuum can be broken down into different products using a catalytic converter, a more expensive process, but, even when this is done, the yield of higher priced petroleum products is less than the yield would be from unprocessed crude.

## II. SUFFICIENCY OF THE EVIDENCE

Because the defendants have assailed the sufficiency of the evidence to support their conviction and because the former jeopardy issue might otherwise arise in the new trial that must ensue, we ad-

dress the evidence-adequacy claims made by the defendants in this appeal despite the necessary reversal of their convictions on other grounds.[2]

█ To establish a mail fraud violation, the government must prove the existence of a scheme to defraud that involved use of the mails for the purpose of executing the scheme. *United States v. Zicree*, 605 F.2d 1381, 1384 (5th Cir. 1979), *cert. denied sub nom.*, 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980). The evidence must demonstrate the defendant's specific intent to commit fraud. *United States v. Freeman*, 619 F.2d 1112, 1117 (5th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981); *United States v. Kent*, 608 F.2d 542, 545 n.3 (5th Cir. 1979), *cert. denied sub nom.*, 446 U.S. 936, 100 S.Ct. 2153–54, 64 L.Ed.2d 788 (1980). Goss and Benson challenge the sufficiency of the proof of a scheme to defraud, their specific intent to commit fraud and use of the mails to transmit the checks and invoices listed in the indictment.

█ The evidence adduced at the spirited trial, which lasted for three and a half weeks including occasional recesses for other judicial business, was susceptible of differing interpretations. Viewed most favorably to the government, as it must now be because of the jury verdict,[3] *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942), the evidence supports the jury's inferences that Benson and Goss engaged in a fraudulent scheme with specific intent to defraud Western.

The contracts entered into by Benson and Goss required Ball Marketing to deliver "crude oil and/or condensate" to Western. Goss falsely certified on sales invoices that crude oil was delivered to Western when, in fact, the product delivered was a mixture of residuum and other refined products. Once this mixture had been thus combined with a large volume of crude oil, the deficiency in quality passed unnoticed by Western and its subsequent customers. Benson admitted that he was aware that Goss was selling Western a mixture instead of unprocessed crude oil.

The chairman of Western's board of directors testified that it was his understanding that Western was buying crude oil, that the product Western purchased from Ball Marketing was recertified by it as crude oil on the strength of Goss's earlier certification, and that he would not have sold a mixture of residuum and kerosene as crude oil.

During a period of almost two years, Ball Marketing paid Benson, the Western employee who arranged its purchases from

---

**2.** A reversal of a conviction for trial error, such as the refusal to give an instruction that the defendant was entitled to have presented to the jury, does not constitute a determination that the government has failed to prove its case, and does not implicate issues of guilt or innocence. *Burks v. United States*, 437 U.S. 1, 15, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1, 12 (1978). Therefore, double jeopardy principles do not preclude retrial of a defendant for the same offense for which he was convicted if that conviction is set aside on the basis of error in the proceedings. *Id.* at 14–16, 98 S.Ct. at 2149, 57 L.Ed.2d at 12. On the other hand, the double jeopardy clause of the fifth amendment does preclude "a second trial once a reviewing court has determined that the evidence introduced at trial was insufficient to sustain the verdict." *Greene v. Massey*, 437 U.S. 19, 24, 98 S.Ct. 2151, 2154, 57 L.Ed.2d 15, 20 (1978); *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

**3.** Although "we must review the evidence through *Glasser* glasses most favorably to the Government," *United States v. Casey*, 540 F.2d 811, 814 (5th Cir. 1976), our judicial vision must not be so distorted that the blemishes in the government's evidence go unnoticed. "*Glasser* does not require complete judicial abdication to the determination of the trier of fact. *United States v. Peterson*, [488 F.2d 645, 649 (5th Cir.), *cert. denied*, 419 U.S. 828, 95 S.Ct. 49, 42 L.Ed.2d 53 (1974).] *Glasser* explicitly requires that a conviction be supported by 'substantial evidence.' " *United States v. Ferg*, 504 F.2d 914, 916 (5th Cir. 1974). *See United States v. Martinez*, 555 F.2d 1269, 1271 (5th Cir. 1977); *United States v. Bright*, 550 F.2d 240, 242 (5th Cir. 1977); *United States v. Barrera*, 547 F.2d 1250, 1255 (5th Cir. 1977).

Ball Marketing, a total of approximately $160,000. Benson received an annual salary from Western of $50,000, which included bonuses and fringe benefits. Thus, the payments from Goss to Benson substantially exceeded Benson's total salary and benefits from his employer. The checks drawn to Benson on Ball Marketing's account were mailed to Benson's home address and not to Western's office. His acceptance of any compensation from a supplier or customer of Western was contrary to company policy and his supervisors were unaware that he was, in fact, receiving these payments.

Therefore, there was sufficient circumstantial evidence to support the jury's conclusion that Goss and Benson engaged in a scheme to defraud Western and that each acted with the requisite specific intent to defraud. For Benson's participation in the scheme, Goss paid him kickbacks or bribes by means of the checks mailed to Benson's home, disguising these payments as commissions.

There was, of course, contrary evidence regarding the nature and purpose of the payments. Based on this evidence, the defendants argued to the jury and to this court that the payments to Benson were commissions unrelated to the residuum mixture sales. There was also evidence that the value of the "reconstituted" product was equal to that of crude oil and that it is considered a proper practice in the petroleum industry to sell a blend of products if it is adequately described. Goss and Benson contend that, given this contrary testimony, there was insufficient evidence that they intentionally engaged in a scheme to defraud Western.

The jury was entitled to, and apparently did, view this defense testimony skeptically. While the jury might consider it reasonable that Goss, a seller whose product buyers were eagerly seeking, wanted to receive some benefit in addition to the controlled price, i. e., Benson's consulting services, they might wonder why the seller would insist not only on paying for advice but

would compute the payments so generously. The jury might also properly view with some disbelief Benson's claim that he accepted approximately $160,000 in commissions but was unaware of the manner in which his compensation was computed and never inquired of Goss as to the compensation formula. Because Goss had been involved in the petroleum business prior to entering into this arrangement with Benson, the jury might conclude that Goss was not a novice in need of Benson's consulting services. The jury might, indeed, find it incredible that Benson, a full-time employee of Western earning $50,000 per year, could render sufficient part-time consulting services to earn double or triple his annual salary from an outside source. The lack of correlation of the dates of the sales of the residuum mixture to Western and the payments to Benson as well as the apparent payment to Benson of "commissions" based on other Ball Marketing transactions aside from those involving the residuum mix might be inadequate to inject a reasonable doubt into the minds of the jurors or might be viewed by them as cleverly contrived.

■ There was testimony that a blend of residuum and diesel fuel or kerosene would satisfy the definition of crude oil contained in the federal pricing regulations promulgated by the Federal Energy Administration. *See* 10 C.F.R. § 212.31 (1976). However, Goss and Benson were not prosecuted for violating the pricing regulation but for engaging in a fraudulent scheme, deceiving Western by supplying a residuum mixture that was not the product Ball Marketing contracted to provide. The testimony that the product complied with the regulatory definition was evidence to be considered by the jury in determining whether Goss and Benson had the requisite specific intent to defraud Western, but it did not compel the conclusion that the two men did not intentionally engage in the deceitful scheme described by the government.

■ Benson argues that, because Western, the intended victim of the fraudulent

scheme, suffered no actual damage due to the sales of the residuum mixture, the evidence is insufficient to support the conviction for mail fraud. In a prosecution for mail fraud, it is not necessary to prove that the intended victim suffered a loss as a result of the scheme to defraud. *United States v. Lea*, 618 F.2d 426, 429 n.3 (7th Cir.), *cert. denied,* —— U.S. ——, 101 S.Ct. 82, 66 L.Ed.2d 25 (1980); *United States v. Reid*, 533 F.2d 1255, 1261 (D.C.Cir.1976). Indeed, proof that the intended victim was actually defrauded is not required to sustain a mail fraud conviction. *United States v. Buchanan*, 633 F.2d 423, 427 (5th Cir. 1980); *United States v. Schaffer*, 599 F.2d 678, 679–80 (5th Cir. 1979).

■ In any event, the record is not devoid of evidence of some loss suffered by Western. The chairman of Western's board of directors testified that, on the strength of Goss's certification, Western recertified the mixture delivered by Ball Marketing as crude oil in the course of reselling the product received from the transactions with Goss. He further testified that it would be damaging to his company's reputation in the industry if it became known that Western had resold the residuum mixture as crude oil. Thus, there was some evidence of potential loss to Western as a result of the residuum mixture sales.

■ Finally, we are treated to a jury argument that Benson informed his supervisor, Mr. Binion, that the product Western purchased from Ball Marketing was a blend and, therefore, Western was not deceived. Binion's testimony was severely impeached on cross-examination and by other evidence that rendered it implausible. The jury did not see fit to credit Binion's testimony and we have no warrant to do so. The testimony of one witness which was apparently discounted by the jury does not necessarily create a reasonable doubt in light of the other evidence that was before the jury for their consideration.

The evidence was not overwhelming. However, it was sufficient to allow a reasonable juror, making the credibility choices that are within the jury's province, to conclude that Benson and Goss acted with the requisite specific intent and entered into both the fraudulent scheme and the conspiracy charged in the indictment.

■ Goss challenges the sufficiency of the proof of mailing of the sixteen Ball Marketing checks made out to Benson and the eight invoices by which Ball Marketing billed Western for the crude. Circumstantial evidence suffices to establish the mailing element of the offense and direct proof of mailing is not required. *United States v. Brackenridge*, 590 F.2d 810, 811 (9th Cir.), *cert. denied,* 440 U.S. 985, 99 S.Ct. 1801, 60 L.Ed.2d 248 (1979); *United States v. Fassoulis*, 445 F.2d 13, 17 (2d Cir.), *cert. denied,* 404 U.S. 858, 92 S.Ct. 110, 30 L.Ed.2d 100 (1971); *Stevens v. United States*, 306 F.2d 834, 835–36 (5th Cir. 1962). Proof of use of the mails may be made out by substantiating a regular business practice of mailing the type of document by which the fraudulent scheme was perpetrated. *United States v. Ledesma*, 632 F.2d 670, 675 (7th Cir. 1980); *United States v. Huber*, 603 F.2d 387, 399 (2d Cir. 1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); *United States v. Joyce*, 499 F.2d 9, 15 (7th Cir.), *cert. denied,* 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974); *United States v. Flaxman*, 495 F.2d 344, 349 (7th Cir.), *cert. denied,* 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974). The evidence presented, though circumstantial and, in some instances, conflicting, was sufficient to support the jury's inference that the checks and invoices identified in the indictment were, in fact, received in the mail.[4] The evidence supporting an inference that

---

4. Although not all of the invoices representing separate counts in the indictment were stamped "received" by Western's office staff, Lafortune, Western's office manager, testified

that the lack of a stamp did not preclude receipt of the invoice by mail. According to Lafortune, the absence of the stamp could have been the result of having multiple copies of the

the sixteen checks were mailed is less definite than the testimony from which it could be deduced that the invoices were mailed. However, there was circumstantial evidence sufficient to permit the jury to infer that each of the sixteen checks was mailed.[5]

## III. JURY INSTRUCTIONS

Goss and Benson contend that their defense was prejudiced by the trial judge's refusal to give certain proposed jury instructions and by the giving of another jury charge to which they objected. We address each of the defendants' contentions separately.

### A. Good Faith Defense

■ The trial judge refused to give a jury instruction proposed by defendants to the effect that the defendants' good faith would operate as a complete defense.[6] We have often held that, if there is any evidentiary support whatsoever for a legal defense, and the trial court's attention is specifically directed to that defense, the trial judge commits reversible error by refusing thus to charge the jury.[7] However, denominating a proposed instruction a theory of defense does not automatically require that it be given. It is not necessary to grant a request that does not concern issues properly before the jury or would tend to confuse them. *United States v. Malatesta*, 583 F.2d 748, 759 (5th Cir. 1978), *modified on rehearing en banc*, 590 F.2d 1379 (5th Cir. 1979), *cert. denied sub nom.*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777, and 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979).

■ Good faith is a complete defense to the charge of intent to defraud under the

invoice, only one of which was stamped, or the lack of a stamp could be attributable to a simple office staff slip up.

5. Simon, who was employed by Ball Marketing as its office manager, testified that most of the "commission" checks were mailed to Benson. On all but three of the checks Benson's home address was typed on the face of the instrument. Two of the checks that do not bear Benson's address were written after Simon began working for Ball Marketing. Simon further testified that when he first began work at Ball Marketing there were no window envelopes among the office supplies and, therefore, Benson's address was sometimes typed on the envelope instead of on the face of the check. Several handwritten instructions by Goss regarding checks to be made out to Benson contained Benson's home address. Thus, the evidence sufficiently established a pattern or practice of mailing the checks to Benson at his residence. Benson admitted receiving one of the checks listed in the indictment in the mail. He also admitted receiving other checks by mail but could not identify them as the checks noted in the indictment.

The testimony of FBI agent Kelleher that the checks made out to Benson were in fact mailed, based on his personal interviews with certain individuals, the prior testimony of other witnesses at trial and the information on the face of the checks, was erroneously admitted by the trial judge over Benson's hearsay objection.

The trial judge overruled the objection after the government claimed that Kelleher was a summary witness. Although the Federal Rules of Evidence permit the admission of summaries of voluminous documentary evidence that cannot be conveniently examined in court, Fed.R.Evid. 1006, *United States v. Gorel*, 622 F.2d 100, 106 (5th Cir. 1979); *United States v. Smyth*, 556 F.2d 1179 (5th Cir.), *cert. denied*, 434 U.S. 862, 98 S.Ct. 190, 54 L.Ed.2d 135 (1977), there is no provision for the admission of summaries of the testimony of out-of-court witnesses. Thus, the agent's testimony as to his belief that the checks were mailed was improperly admitted and we do not rely on it in determining the sufficiency of the evidence of mailing.

6. The instruction requested by the defendants would have charged the jury on the good faith defense as follows:

If the evidence in this case leaves you with a reasonable doubt whether the defendant had a good faith belief that his assertions were truthful and not fraudulent at the time of the alleged mailings, then you should acquit the defendant.

7. *See, e. g., United States v. Barham*, 595 F.2d 231, 244 & n.18 (5th Cir. 1979); *United States v. Lewis*, 592 F.2d 1282, 1285 (5th Cir. 1979); *United States v. Timberlake*, 559 F.2d 1375, 1379 (5th Cir. 1977); *United States v. Taglione*, 546 F.2d 194, 197-98 (5th Cir. 1977).

mail fraud statute.[8] Because good faith was an available defense, we must determine whether, construing the evidence most favorably to the defense, there was an underlying evidentiary foundation to support the defendants' good faith claim, regardless of how weak, inconsistent or dubious the evidence of good faith may have been. *United States v. Lewis*, 592 F.2d 1282, 1286 (5th Cir. 1979).

■ On the record presented we cannot say that there was no evidentiary basis upon which the defendants could rest a good faith defense. Benson's supervisor, Mr. Binion, testified that Benson had informed him that the product received from Ball Marketing was a residuum mixture. Others testified that such a mixture could be considered crude oil as that term is understood in the industry. There was testimony that the invoices Goss signed certifying that the residuum mixture was crude oil were designed merely for price-control regulation purposes and that the residuum mixture did indeed satisfy the regulatory definition of crude oil. Therefore, the defendants were entitled to have their good faith defense presented squarely to the jury.

The trial judge did charge the jury that a finding of specific intent to defraud is required for conviction. The government urges us to find this sufficient to encompass the good faith defense. Indeed, the trial judge relied on *United States v. Wilkinson*, 460 F.2d 725, 729 (5th Cir. 1972), for the proposition that the giving of the specific intent instruction renders the good faith charge unnecessary.

■ *Wilkinson* will not support the weight thus rested on it. In that mail fraud prosecution, the trial judge in fact gave an instruction incorporating the good faith defense, although he refused to couch that instruction in the language of the charge offered by the defendant. Thus, *Wilkinson* does not hold that, if a charge with respect to specific intent is given, then a jury instruction on the defense of good faith is unnecessary. Charging the jury that a finding of specific intent to defraud is required for conviction, while it may generally constitute the negative instruction, *i. e.*, that, if the defendants acted in good faith, they could not have had the specific intent to defraud required for conviction, does not direct the jury's attention to the defense of good faith with sufficient specificity to avoid reversible error.

## B. Fiduciary Duty

The trial judge charged the jury that, if they found that Benson was employed by Western for the purpose of negotiating crude oil transactions, then he stood in a fiduciary relationship to Western. She further charged them that, if they found that Benson had knowingly used his fiduciary position to obtain secret profits for his own personal benefit at his employer's expense, that breach of his fiduciary duty constituted an act of fraud for purposes of the mail fraud statute.[9]

■ Benson argues that he did not in fact stand in a fiduciary relationship to

---

**8.** *See United States v. Lewis*, 592 F.2d 1282, 1286 (5th Cir. 1979) (dictum); *United States v. Foshee*, 578 F.2d 629, 634 (5th Cir. 1978); *United States v. Boswell*, 565 F.2d 1338, 1343 (5th Cir.), *cert. denied*, 439 U.S. 819, 99 S.Ct. 81, 58 L.Ed.2d 110 (1978); *Kroll v. United States*, 433 F.2d 1282, 1290–91 (5th Cir. 1970), *cert. denied*, 402 U.S. 944, 91 S.Ct. 1616, 29 L.Ed.2d 112 (1971); *United States v. Diamond*, 430 F.2d 688, 697 (5th Cir. 1970); *Coleman v. United States*, 167 F.2d 837, 841 (5th Cir. 1948).

**9.** The court charged the jury on Benson's fiduciary duty as follows:

If you find beyond a reasonable doubt that the defendant, George Benson, was employed by Western Crude Oil Incorporated for the purpose of, among other things, negotiating with customers for the purchase and sale of crude oil, and crude oil products for the benefit of Western Crude Oil Incorporated, then you are instructed that the defendant stood in a fiduciary relationship to Western Crude Oil Incorporated.

Such a fiduciary relationship would require that the defendant exercise utmost good faith in his relations with the corporation and

Western. We disagree. Benson carried the titles of Vice President and Regional Manager. The jury could properly find that he negotiated contracts for the purchase and sale of crude oil on behalf of his employer. Under these circumstances, the trial court justifiably charged the jury as a matter of law that Benson held a fiduciary position with respect to his employer.

The defendants objected to the remainder of this instruction on the ground that it singled out Benson for special attention, failed to specify that Goss was not a fiduciary, did not clearly incorporate the element of specific intent as required to establish a mail fraud violation and did not adequately set out the law on fiduciary relationships.

■■■■ A kickback scheme that deprives the employer of the faithful and honest services of its employee constitutes a scheme to defraud for purposes of the mail fraud statute.[10] However, breach of a fiduciary duty, standing alone, is insufficient to establish a mail fraud violation; proof of a recognizable scheme formed with specific intent to defraud and the use of the mails in furtherance thereof is also required. *United States v. Bohonus*, 628 F.2d 1167, 1172 (9th Cir. 1980); *United States v. McDonald*, 576 F.2d 1350, 1359 n.14 (9th Cir.), *cert. denied sub nom.*, 439 U.S. 830, 99 S.Ct. 105, 58 L.Ed.2d 124, 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978); *Post v. United States*, 407 F.2d 319, 329 (D.C.Cir.1968), *cert. denied*, 393 U.S. 1092, 89 S.Ct. 863, 21

L.Ed.2d 784 (1969) (breach of fiduciary duty does not itself constitute active fraud and proof of specific intent to defraud is required).

■■■■ It was, therefore, correct to charge the jury that Benson's breach of his fiduciary duty to Western constituted an act of fraud for purposes of the mail fraud statute. The instruction did not improperly single out Benson for special attention, nor was it necessary to point out to the jury that Goss did not stand in a fiduciary relationship to Western. If, on retrial, the court decides thus to elaborate the charge, it has discretion to do so.

■■■■ The trial judge's instruction, however, did not adequately explain that the breach of the fiduciary's duty alone does not constitute a violation of the mail fraud statute. The charge should specifically inform the jury that the violation of a fiduciary duty, though an act of fraud within the meaning of the statute, must be coupled with the additional findings that the defendant devised a scheme to defraud and did so with specific intent to defraud. Although the trial judge did, before giving the fiduciary duty charge, instruct the jury on the requisite elements of a mail fraud violation, the fiduciary duty instruction was couched in language susceptible to a jury interpretation that, if they found that Benson had breached his fiduciary obligation, that was the end of the inquiry.[11] The trial

make full disclosure to the corporation of any hidden interest he might have in the contracts and sales he was negotiating.

If you find beyond a reasonable doubt that the defendant knowingly used that fiduciary position to obtain or attempt to obtain secret profits for his own personal use and benefit at the expense of Western Crude Oil Incorporated, then *that would not only be a breach of fiduciary duty, but an act of fraud within the meaning of the mail fraud statute* (emphasis supplied).

10. *United States v. Bohonus*, 628 F.2d 1167, 1172 (9th Cir. 1980); *United States v. Reece*, 614 F.2d 1259, 1261 (10th Cir. 1980); *United States v. Castor*, 558 F.2d 379, 383 (7th Cir. 1977), *cert. denied*, 434 U.S. 1010, 98 S.Ct. 720,

54 L.Ed.2d 752 (1978); *United States v. Dixon*, 536 F.2d 1388, 1399 (2d Cir. 1976) (dictum); *United States v. Bryza*, 522 F.2d 414, 421–22 (7th Cir. 1975), *cert. denied*, 426 U.S. 912, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976); *United States v. George*, 477 F.2d 508, 512 (7th Cir.), *cert. denied*, 414 U.S. 827, 94 S.Ct. 155, 38 L.Ed.2d 61 (1973); *Post v. United States*, 407 F.2d 319 (D.C.Cir.1968), *cert. denied*, 393 U.S. 1092, 89 S.Ct. 863, 21 L.Ed.2d 784 (1969). *See Abbott v. United States*, 239 F.2d 310 (5th Cir. 1956).

11. Although the indictment did not expressly spell out the fraudulent scheme which Benson and Goss were accused of devising in terms of a breach of Benson's fiduciary duty to his employer, it afforded sufficient notice of this

judge's instruction was itself so deficient as to constitute reversible error.

We are, therefore, required to reverse the judgments of conviction and remand for a new trial. Nevertheless, we consider the remaining contentions likely to reappear as issues in the new trial.

## C. Definition of Crude Oil

The trial judge refused to charge the jury on the definitions of crude oil and covered product set forth in the Federal Energy Administration's pricing regulations [12] that were effective during the period that the residuum mixture was sold to Western. The defendants contend that the mixture sold by Ball Marketing to Western complied with the regulatory definition of crude oil. They claim that it was essential to charge the jury on these definitions because compliance with the regulatory definition of crude oil would support their defense that the invoicing of the residuum blend as crude oil was acceptable under the regula-

tions, thus establishing their lack of the required specific intent to defraud Western.

■ The definitions deal only with federal pricing regulations and do not necessarily provide the meaning of the term crude oil for industrial purposes. There was, indeed, conflicting testimony by petroleum industry experts concerning whether or not the residuum blend was crude oil as that term is understood in the industry. The trial judge did not err in leaving to the jury the twin questions whether the residuum mixture was crude oil and whether, even if it were not, Benson and Goss believed it to be.

The trial judge permitted the regulatory definitions to be read to the jury during the trial. Argument could properly be based on them. It was not error for the judge to refuse in addition to charge the jury that the residuum mixture was crude oil within the meaning of the regulation or to refuse to include the regulatory definitions in her jury charges.

charge. "The test of sufficiency is not whether the indictment could have been more artfully or precisely drawn, but whether it states the elements of the offense intended to be charged and adequately apprises the defendant of that which he must be prepared to meet." *United States v. Contris*, 592 F.2d 893, 896 (5th Cir. 1979). The indictment fully set forth the elements of the mail fraud offense. *See United States v. Bush*, 599 F.2d 72, 74 (5th Cir. 1979). Although it did not cast the fraudulent scheme in terms of a breach of fiduciary duty, it sufficiently apprised Benson of the charge against him of defrauding his employer, the equivalent of a breach of a fiduciary obligation for someone in Benson's position.

The proof at trial and the jury charge on Benson's breach of fiduciary duty did not vary sufficiently from the charges alleged in the indictment to warrant reversal. Variance between indictment and proof is fatal only when it affects the substantial rights of the accused by failing sufficiently to notify him of the charges against him so that he may prepare a proper defense. *United States v. Georgalis*, 631 F.2d 1199, 1205 (5th Cir. 1980). Benson was not prejudiced by the failure of the indictment to couch the scheme to defraud in terms of a breach of a fiduciary duty. *See United States v. DeLeon*, 641 F.2d 330, 336 (5th Cir. 1981); *United States v. Tilton*, 610 F.2d 302, 307 (5th Cir. 1980); *United States v. Perez*, 489

F.2d 51, 57 (5th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974).

**12.** The definitional section of the regulations, 10 C.F.R. § 212.31 (1976), described a "covered product" as follows:

"Covered product" means aviation fuels, benzene, butane, crude oil, gas oil, gasoline, greases, hexane, kerosene, lubricant base oil stocks, lubricants, naphthas, natural gas liquids, natural gasoline, No. 1 heating oil and No. 1-D diesel fuel, No. 2 heating oil and No. 2-D diesel fuel, No. 4 fuel oil and No. 4-D diesel fuel, propane, residual fuel oil, special naphthas (solvents), toluene, unfinished oils, xylene, and other finished products. A blend of two or more particular covered products is considered to be that particular covered product constituting the major proportion of the blend.

"Crude oil" as defined in 10 C.F.R. § 212.31 (1976) means a mixture of hydrocarbons that existed in liquid phase in underground reservoirs and remains liquid at atmospheric pressure after passing through surface separating facilities. "Crude oil" includes condensate recovered in associated or non-associated production by mechanical separators, whether located on the lease, at central field facilities, or at the inlet side of a gas processing plant.

## D. Imputed Knowledge

The trial judge also refused to charge the jury that knowledge gained by a corporation's officers in the scope of their office is considered by law to be knowledge of the corporation. As we have related, Benson's supervisor at Western, Mr. Binion, testified that Benson had told him the product was a residuum mixture.

 The proposed instructions were rejected by the trial judge because they did not distinguish between legal and illegal actions taken by a corporate officer and thus did not accurately state the law regarding the officer's ability to bind the corporation. Moreover, the instructions could be confusing to the jury because they did not differentiate Benson from other Western officers who may have had knowledge of the dealings with Goss. Thus, the jury might assume from the proposed charges that Benson's awareness of the residuum purchases could be imputed to the corporation thus putting Western on notice that it was receiving a residuum mixture from Ball Marketing. The trial judge is not required to accept a proffered instruction that would confuse or mislead the jury. *United States v. Malatesta*, 583 F.2d at 759.

Unlike the good faith issue discussed above, the contention that Binion's alleged knowledge of the residuum sales was attributable to the corporation is not necessarily a complete defense to the fraud charges. The defendants may have intended to deceive the corporation's management but simply felt that their secret could be safely confided to Binion. The trial judge recognized that, in any event, if Binion acted illegally, *i. e.*, was implicated in the scheme, his knowledge could not bind the corporation.

Although ratification of the residuum purchases by Western may have mandated a conclusion that the corporation was adequately informed of the nature of the product it was receiving and had indeed agreed to purchase the residuum mixture, Binion did not necessarily hold a sufficient position of authority in the corporation to have ratified the residuum sales such that there would have been no scheme to defraud. Thus, the proposed instructions did not cover an issue presented by the facts as revealed by the evidence and the trial judge was, therefore, not required to accept the proposed charges. *United States v. Brooks*, 611 F.2d 614, 619 (5th Cir. 1980).

 If the jury credited Binion's testimony that Benson had informed him of the residuum purchases, that evidence could be weighed by the jury in determining whether Benson acted with specific intent to defraud Western. The trial judge's refusal to give a proposed instruction that incorporates an issue adequately covered in other portions of the jury charge is not reversible error. *United States v. L'Hoste*, 609 F.2d 796, 805 (5th Cir.), *cert. denied*, —— U.S. ——, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980); *United States v. McLaurn*, 580 F.2d 811, 812 (5th Cir. 1978).

## IV. MOTION TO SUPPRESS

 The trial court did not err in denying the motion to suppress documentary evidence obtained by Federal Energy Administration officials in a civil audit. The defendants contend that this evidence was sought only after the decision had been made to prosecute Benson and after repeated assurances to counsel for Goss that no criminal investigation was in process. They claim that the government's assurances were deceitful because a criminal investigation was, in fact, being conducted at that time. The burden of proving that the government has resorted to deception by misrepresenting the purpose of the audit is on the party moving to suppress the evidence on the ground that it was obtained as the product of an unreasonable search conducted in violation of the fourth amendment. *United States v. Tweel*, 550 F.2d 297, 299 (5th Cir. 1977). *See United States v. Meier*, 607 F.2d 215, 217 (8th Cir. 1979),

*cert. denied*, 445 U.S. 966, 100 S.Ct. 1658, 64 L.Ed.2d 243 (1980).

The trial judge conducted a thorough hearing, covering 300 pages of transcript, on the motion to suppress. Based on her review of the testimony and her judgment of the credibility of the witnesses, she determined that the assurances provided by the federal officials were truthful when made. We consider this determination to be a finding of fact subject to constricted review by this court under the clearly erroneous standard. *See United States v. LaSalle National Bank*, 437 U.S. 298, 305, 98 S.Ct. 2357, 2361, 57 L.Ed.2d 221, 228 (1978). Because the trial court's factual finding that the assurances were truthful when made is not clearly erroneous, the evidence was properly admitted.

For these reasons the judgments are REVERSED and the case is REMANDED for further proceedings consistent with this opinion.