[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-10601

_____

D.C. Docket No. 1:15-cr-00009-LJA-TQL-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

TAMARA ANDREATTA,
STACY RIX,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Middle District of Georgia

_____

(June 11, 2018)

Before MARTIN, JULIE CARNES, and GILMAN,* Circuit Judges.

MARTIN, Circuit Judge:

_____

* Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation.

Tamara Andreatta and Stacy Rix appeal their convictions for wire fraud and aggravated identity theft based on their use of corporate credit cards to make personal purchases. Ms. Andreatta maintains she was authorized to use the credit cards by the company's owner and CEO, Jim Whitten, who offered her use of the cards in exchange for sex. Mr. Rix says he had no knowledge of the purchases.

The defendants challenge the District Court's exclusion of a pair of defense witnesses as well as the court's refusal to give a jury instruction on the good-faith defense. They also argue it was error for the District Court to deny their motions for judgments of acquittal.

After careful review, and with the benefit of oral argument, we affirm.

## I.  BACKGROUND

A.    FACTUAL BACKGROUND

Ms. Andreatta and Mr. Rix have been in a relationship since 1989. They lived together with their two children. Ms. Andreatta handled the family's combined finances.

In early 2006, Mr. Rix and Ms. Andreatta began working for Industrial Manufacturing in Albany, Georgia. Mr. Rix was hired as a technician. Industrial gave him a corporate credit card to pay business expenses and required him to keep it in an office lockbox when he wasn't traveling. Ms. Andreatta was hired as an accounts payable clerk, which required her to process vendor invoices, purchase

2

orders, and credit card bills for Industrial.  She was not given a corporate credit card.

At some point in 2006, Ms. Andreatta asked Mr. Whitten for a loan.  He lent her $3,000, to be paid back in $100 weekly deductions from her paycheck.  Later, Ms. Andreatta had a conversation near Mr. Whitten's office with another employee about her financial troubles.  Mr. Whitten then called her into his office.  Ms. Andreatta testified that Mr. Whitten said "he could help me if I helped him," which she understood to mean he'd help her financially if she had sex with him.  Ms. Andreatta was shocked and left his office, but later returned and accepted his proposal.

According to Ms. Andreatta, Mr. Whitten then offered her the use of the company credit cards.  He told her to "use them as [she] needed them [and] just to make sure the bills got paid."  He also told her to hold onto the credit card of Shirley Richards, a purchasing agent who was leaving the company.  About two weeks later, Ms. Andreatta and Mr. Whitten met at a hotel and had sex.  Two days after that, Ms. Andreatta began using Ms. Richards's credit card.  Ms. Andreatta testified that Mr. Whitten called her sporadically from November 2006 through 2012—roughly every two to three weeks but sometimes twice a week—to arrange to meet and have sex.  Ms. Andreatta never asked Mr. Whitten how often she could

3

use Ms. Richards's card, how much money she could spend, or what she could use it for.

In 2006 Industrial had an unwritten policy that company credit cards could be used only for business expenses. This policy was written into the employee handbook in 2010. Due to her position in accounts payable, Ms. Andreatta knew Industrial had issued cards to non-employees, including Mr. Whitten's ex-wife. She also had access to the credit card statements and knew both Mr. Whitten and his ex-wife used the company credit cards for personal expenses, including clothing, vehicle repairs, and trips. Ms. Andreatta tried to use Ms. Richards's card in the same way as Mr. Whitten and his ex-wife used theirs.

Ms. Andreatta used Ms. Richards's and, later, Barbara Griner's[1] cards to get cash advances and make deposits into her and her mother's personal accounts. Those cards were also used to make car payments, pay for auto insurance for cars owned by Ms. Andreatta and Mr. Rix, and pay for the family's phone bill, among other personal expenses. Mr. Rix's card also showed a number of purchases for personal items, including Carnival Cruise tickets and airline tickets to Miami for Ms. Andreatta, Mr. Rix, and their two children. Mr. Rix's card was also used to buy auto parts for a Chevrolet Corvette, which were then shipped to Mr. Rix. One time, Mr. Rix purchased four Corvette tires in person with his corporate credit

---

[1] Barbara Griner stopped working for Industrial in 2012, at which point Ms. Andreatta began using Ms. Griner's company credit card.

4

card.  From 2006 to 2013, the total amount of credit card purchases, cash advances, and direct deposits for Ms. Andreatta and Mr. Rix's personal use was $466,692.41. Notwithstanding this supposed arrangement with Mr. Whitten, Ms. Andreatta obtained a $6,000 loan from Mr. Whitten in 2008 that she repaid, pursuant to a promissory note, through $100 deductions from each of her paychecks.

To pay the company's credit card bills, Ms. Andreatta typically processed the receipts and generated a check that Mr. Whitten, or two other senior employees, would review and sign.  Ms. Andreatta used her role in Industrial's accounts payable division to alter company ledgers to disguise payments being made from the credit cards assigned to Mr. Rix, Ms. Richards, and Ms. Griner. She also took the credit card statements out of the mail before Mr. Whitten could see them.  Mr. Whitten said he didn't always follow the company's policy of reviewing receipts to see if they matched the credit card statements.  Ms. Andreatta received approval to pay each of the credit card bills when they were due.  Mr. Whitten estimated he signed 35 of the 159 credit card checks that were issued by Industrial between 2006 and 2013.

In August 2013, Mr. Whitten was traveling for business when his corporate credit card was declined.  He learned from the credit card company that the corporate account was overdrawn, and there were charges on the corporate cards assigned to Ms. Richards and Ms. Griner.  Elzora Dean, Industrial's office

5

manager, investigated the credit card charges. Ms. Andreatta told Ms. Dean she had used the cards assigned to Ms. Richards and Ms. Griner. Mr. Whitten then instructed Ms. Dean to call the police.

Mr. Whitten suspected Mr. Rix might have been involved in the scheme. In November, Mr. Whitten confronted Mr. Rix. Mr. Whitten testified: "[Mr. Rix] admitted that [Ms. Andreatta] had made those charges on his account. Basically, at that point in time, I realized that he was just as guilty as her. He knew, he knew about it." Mr. Whitten then fired Mr. Rix.

Mr. Whitten denied ever having sex with Ms. Andreatta or giving her permission to use the company credit cards. He confirmed making calls to Ms. Andreatta after 10 PM, which he said was his cut-off time for making work-related calls.

## B.   PROCEDURAL HISTORY

Ms. Andreatta and Mr. Rix were charged in a nine-count indictment with conspiracy to commit wire fraud (Count One), six counts of substantive wire fraud (Counts Two to Seven), and two counts of aggravated identity theft (Counts Eight and Nine). The case went to trial.

At the close of the government's case-in-chief, Ms. Andreatta and Mr. Rix both made oral motions for a judgment of acquittal. The District Court denied Ms. Andreatta's motion as to Counts Three, Four, Six and Seven, and reserved ruling

6

on Counts One,[2] Two, Five, Eight and Nine.  The District Court denied Mr. Rix's motion as to Counts Two and Five, and reserved ruling on the remaining seven counts.

Ms. Andreatta then testified in her own defense.  She described in detail how Mr. Whitten propositioned her for sex, how she met him whenever he demanded sex, and how she understood that in exchange she was authorized to use the corporate credit cards.  She also testified that Mr. Rix did not know about her use of corporate credit cards for personal charges, including the charges on Mr. Rix's corporate card.

Ms. Andreatta attempted to call Jennifer Owens as a witness.  Her attorney proffered that Ms. Owens would testify that Mr. Whitten had once propositioned Ms. Owens for sex in his office.  The District Court excluded Ms. Owens's testimony because it was not relevant to whether Mr. Whitten had, at a different time, offered Ms. Andreatta authorization to use the corporate credit cards.

---

[2] There is some conflict in the record over the District Court's ruling on Count One.  At the close of the government's case-in-chief, the court stated "[a]s to Count 1, I'm going to overrule your motion."  However, when Ms. Andreatta renewed her motion after presenting her evidence, the court stated "I'll continue to reserve ruling on 1, 2, 5, 8, 9."  Later, when the court ruled on Mr. Rix's written motion for judgment of acquittal, it indicated that it had reserved ruling on Count One with respect to both Mr. Rix and Ms. Andreatta, and discussed that Count in the order denying the motion.  Taking the record as a whole, we understand that the District Court did not orally deny the motion as to Count One, but instead reserved ruling on it until after the jury rendered its verdict.

After presenting her case Ms. Andreatta renewed her motion for a judgment of acquittal.  The District Court continued to reserve its ruling on Counts One, Two, Five, Eight and Nine.  Mr. Rix also renewed his motion, and the District Court restated its earlier ruling.

Mr. Rix then recalled Ms. Dean and attempted to ask her about Mr. Whitten's statements explaining why he fired Mr. Rix.  The District Court sustained the government's hearsay objection and did not allow Ms. Dean to testify to those statements.

At the close of evidence, Ms. Andreatta asked the District Court to give an instruction on the defense of good faith.  The District Court refused the proposed good-faith instruction, ruling that those issues were already covered by the instructions defining willfulness and the intent to defraud.

The jury convicted Ms. Andreatta on all nine counts.  The jury found Mr. Rix guilty on Counts One through Seven but acquitted on Counts Eight and Nine, which were the aggravated identity theft charges.

After the jury verdict, Mr. Rix renewed in writing his motion for a judgment of acquittal.  The District Court denied the written motion, as well as the oral motions for judgment of acquittal that it had reserved ruling on during trial.  The District Court found the government had introduced sufficient evidence at trial that, if believed, would allow a jury to find the defendants guilty beyond a

8

reasonable doubt.  The District Court sentenced Ms. Andreatta to 61-months imprisonment and sentenced Mr. Rix to 24 months.

Both Ms. Andreatta and Mr. Rix filed the appeals we consider here.

## II.  DISCUSSION

Ms. Andreatta and Mr. Rix collectively raise six issues on appeal: (1) whether Ms. Owens should have been allowed to testify; (2) whether Ms. Dean should have been allowed to testify during Mr. Rix's case-in-chief; (3) whether the District Court should have instructed the jury on the defense of good faith; (4) whether the government sufficiently proved a conspiratorial agreement; (5) whether the government sufficiently proved lack of authorization; and (6) whether the government sufficiently proved Mr. Rix's involvement in the fraud.

### A.    EXCLUDED WITNESS TESTIMONY

The District Court's evidentiary decisions are reviewed for abuse of discretion.  United States v. Todd, 108 F.3d 1329, 1331–32 (11th Cir. 1997).  "A district court abuses its discretion if it misapplies the law or makes findings of fact that are clearly erroneous."  Kelley v. Sec'y for Dep't of Corr., 377 F.3d 1317, 1333 (11th Cir. 2004).  The District Court's discretion "does not . . . extend to the exclusion of crucial relevant evidence necessary to establish a valid defense."  Todd, 108 F.3d at 1332 (quotation omitted).  "When proffered evidence is of substantial probative value, and will not tend to prejudice or confuse, all doubt

should be resolved in favor of admissibility." Id. (quotation omitted); see also Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). Evidentiary decisions are subject to harmless-error analysis. United States v. Khanani, 502 F.3d 1281, 1292 (11th Cir. 2007).

### 1. Jennifer Owens

Ms. Andreatta argues that the District Court should not have excluded Ms. Owens's testimony.

In her factual proffer during trial, Ms. Andreatta explained that Ms. Owens was a former Industrial employee whom Mr. Whitten propositioned for sex in his office in exchange for money. When Ms. Owens refused, she was fired. Ms. Andreatta argued Ms. Owens's testimony would corroborate her account by showing that Mr. Whitten had a pattern of propositioning employees for sex.[3]

The District Court did not allow Ms. Owens's testimony, stating the relevant issue was not whether Ms. Andreatta had a sexual relationship with Mr. Whitten, but whether Mr. Whitten had given her permission to use the corporate credit cards. Because Ms. Owens was not going to testify about Mr. Whitten offering use

---

[3] Ms. Andreatta also argued at trial that Ms. Owens's testimony could be used to impeach Mr. Whitten, but she did not raise that argument on appeal.

10

of the corporate credit cards, the District Court excluded her testimony as irrelevant. The District Court also found that, "even if I did deem it relevant, the prejudicial value certainly outweighs any probative effect."

The District Court did not abuse its discretion in excluding this testimony. The District Court reasoned that even if the jury believed Mr. Whitten propositioned Ms. Andreatta for sex, this would not answer the question of whether Mr. Whitten authorized her to use the corporate credit cards. The District Court did not abuse its discretion by excluding Ms. Owens's testimony. The salacious details of Ms. Owens's testimony could well have distracted from the relevant question of whether Ms. Andreatta was authorized to use the company credit cards for personal use. See Fed. R. Evid. 403.

### 2. Elzora Dean

Mr. Rix contends the District Court should have allowed Ms. Dean to testify during his case-in-chief. He argues Ms. Dean's testimony would have impeached Mr. Whitten's testimony about why he fired Mr. Rix. Generally, impeachment testimony based on a prior inconsistent statement is allowed as an exception to the hearsay rule. See Khanani, 502 F.3d at 1292; see also Fed. R. Evid. 613.

On direct examination, Mr. Whitten testified "[Mr. Rix] told me that he knew that Tami was making these charges on his credit card." On cross examination, Mr. Rix's attorney asked Mr. Whitten the following question:

> Could you have told Ms. Dean, went to her and said what do you think about Stacy, I can't have him in here, whether he knew about it or not, he knows about it now, he's living with her?  And then you went out there and fired him, fired Mr. Rix.

Mr. Whitten responded, "I don't recall making that—I don't recall that statement. I don't recall making it to Tami, but it does sound like something I might say because this—I was concerned, sir."  Mr. Rix's attorney asked Mr. Whitten again if he told Ms. Dean that "I can't have [Mr. Rix] in here, whether he knew about it or not, he knows about it now, he's still living with her."  Mr. Whitten responded, "That's right.  He's still living with her."  The District Court found there was no prior inconsistent statement and therefore did not permit Ms. Dean's testimony.

Mr. Rix argues this ruling is at odds with United States v. Billue, 994 F.2d 1562 (11th Cir. 1993), which held "[t]he law is clear that if a witness has denied making a statement or has failed to remember it, the making of the statement may be proved by another witness."  Id. at 1565–66.  But Billue does not describe the situation here.  Mr. Whitten's statement falls somewhere between a denial and an affirmation: it's the lack of a denial.  And he didn't merely say he didn't remember—he conceded "it does sound like something I might say."  And when the question was rephrased, he agreed with the premise of his alleged statement. For this reason, the exclusion of Ms. Dean's testimony does not rise to the level of an abuse of discretion.

12

Even if it was error to exclude Ms. Dean's testimony, the error is harmless. See Olden v. Kentucky, 488 U.S. 227, 232, 109 S. Ct. 480, 483 (1988) ("The constitutionally improper denial of a defendant's opportunity to impeach a witness . . . is subject to . . . harmless-error analysis." (quotation omitted)).  The jury heard Mr. Whitten say on direct that Mr. Rix knew of the fraud, but they also heard him say on cross that he might have told Ms. Dean he didn't care whether Mr. Rix knew.  That inconsistency—of whatever degree—was already before the jury.

Mr. Rix nonetheless argues "there was no other direct evidence to support the allegation that [he] was aware of Ms. Andreatta's unauthorized use of company credit cards."  This is not true.  There was testimony that Mr. Rix had used his company credit card to buy tires for his Corvette, thus showing a personal involvement in the scheme.  And the jury could infer his knowledge from circumstantial evidence—the scope of the credit card payments, Mr. Rix's receipt of the benefits, and his close relationship with Ms. Andreatta.

For these reasons, the exclusion of Ms. Dean's testimony from Mr. Rix's case-in-chief was not an abuse of discretion.

B.    GOOD-FAITH JURY INSTRUCTION

Ms. Andreatta argues the District Court erred by refusing to instruct the jury on her good-faith defense.

13

"The district court's refusal to deliver a jury instruction requested by defendant constitutes reversible error if the instruction (1) is correct, (2) is not substantially covered by other instructions which were delivered, and (3) deals with some point in the trial so vital that the failure to give the requested instruction seriously impaired the defendant's ability to defend."  United States v. Opdahl, 930 F.2d 1530, 1533 (11th Cir. 1991) (quotations omitted).

> Prior to trial, Ms. Andreatta proposed the following instruction:
>
> "Good faith" is a complete defense to a charge that requires intent to defraud.  A defendant isn't required to prove good faith.  The Government must prove intent to defraud beyond a reasonable doubt.
>
> An honestly held opinion or an honestly formed belief cannot be fraudulent intent—even if the opinion or belief is mistaken.  Similarly, evidence of a mistake in judgment, an error in management, or carelessness can't establish fraudulent intent.
>
> But an honest belief that a business venture would ultimately succeed doesn't constitute good faith if the Defendant intended to deceive others by making representations the Defendant knew to be false or fraudulent.

The District Court excluded this proposed instruction because it was duplicative of other instructions that defined "willful" and "intent to defraud."

In United States v. Goss, 650 F.2d 1336 (5th Cir. Unit A. July 1981), the Fifth Circuit held a District Court's refusal to give a good-faith instruction was

reversible when there was "any evidentiary support whatsoever" for it.[4] Id. at 1344–45. Cases since then have not used this "any evidence" standard, but have focused instead on whether the requested instruction was duplicative of the instructions already given.[5] See Opdahl, 930 F.2d at 1533. For instance, in United States v. McNair, 605 F.3d 1152 (11th Cir. 2010), this Court affirmed the refusal to give a good-faith instruction because the District Court had given an instruction defining the "intent to defraud" that "necessarily excludes a finding of good faith," meaning the requested charge was "substantially covered by other instructions that were delivered." Id. at 1201 n.65 (quotation omitted).

This case is indistinguishable from McNair. The District Court here instructed the jury that it could convict only if Ms. Andreatta's actions were done knowingly or willfully. The court defined "knowingly" to mean "that an act was done voluntarily and intentionally," and defined "willfully" to mean "the act was committed voluntarily and purposely, with the intent to do something that the law forbids, that is, with a bad purpose to disobey or disregard the law." For the substantive fraud counts, the District Court instructed the jury that the government needed to prove intent to defraud, and defined "intent to defraud" as "a specific

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. Id. at 1209.

[5] The Fifth Circuit has abandoned the Goss standard. See United States v. Hunt, 794 F.2d 1095, 1097–98 (5th Cir. 1986) (noting that "later caselaw has effectively by-passed [Goss]").

intent to deceive or cheat someone, usually for personal financial gain, or to cause financial loss to someone else." This last instruction is very similar to the instruction at issue in McNair. See id. at 1201 n.65 ("The court defined 'intent to defraud' as 'to act knowingly and with the specific intent to deceive someone.'").

Ms. Andreatta argues the good-faith instruction was nonetheless necessary because the "bad purpose" language of the court's instruction might have led to jury confusion. As her counsel explained at oral argument, Ms. Andreatta took steps to hide her affair from her coworkers, and without further instruction the jury could have misinterpreted that as evidence of willful fraud. However the "bad purpose" language included in the jury charge did not arise in isolation. The District Court explained that "willfully" included acts done "with a bad purpose to disobey or disregard the law." From this instruction, the jury could convict only if it found that Ms. Andreatta's "bad purpose" was to break the law.

Because the substance of the good-faith instruction was covered by other instructions, any error in refusing to give the instruction does not warrant reversal. See Opdahl, 930 F.2d at 1533. That said, the government conceded at oral argument it should not have objected to the good-faith instruction, and the District Court "would have been wiser" to give the requested instruction. See United States v. Martinelli, 454 F.3d 1300, 1317 (11th Cir. 2006).

16

C.    MOTIONS FOR ACQUITTAL

Both defendants challenge the District Court's denial of their motions for judgment of acquittal, including the oral motions made at trial and Mr. Rix's written motion.[6]

The District Court's denial of a motion for judgment of acquittal is reviewed de novo, viewing "the evidence in the light most favorable to the government and [drawing] all reasonable inferences and credibility choices in favor of the jury's verdict." United States v. Vernon, 723 F.3d 1234, 1266 (11th Cir. 2013) (quotation omitted). "To uphold the denial of a Rule 29 motion, we need only determine that a reasonable fact-finder could conclude that the evidence established the defendant's guilt beyond a reasonable doubt." United States v. Descent, 292 F.3d 703, 706 (11th Cir. 2002) (per curiam) (quotation omitted).

If the District Court "reserves ruling on a motion for judgment of acquittal, the court must decide the motion on the basis of the evidence at the time the ruling was reserved." United States v. Moore, 504 F.3d 1345, 1346 (11th Cir. 2007). This means the District Court looks to "a snapshot of the evidence at the point that the court reserves its ruling." Id. at 1347.

---

[6] Ms. Andreatta challenges only the rulings on the conspiracy charge and aggravated identity theft charges. She does not challenge her convictions on the substantive wire fraud charges.

17

1.  Conspiratorial Agreement

Both defendants argue the government did not sufficiently prove an agreement to commit wire fraud.

A conviction for conspiracy to commit wire fraud under 18 U.S.C. § 1349 requires proof of "(1) intentional participation in a scheme to defraud, and, (2) the use of the interstate . . . wires in furtherance of that scheme." United States v. Maxwell, 579 F.3d 1282, 1299 (11th Cir. 2009). "A scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property." Id. Unlike the generic federal conspiracy statute, 18 U.S.C. § 371, a conviction under 18 U.S.C. § 1349 does not require proof of an overt act in furtherance of the conspiracy. See United States v. Moran, 778 F.3d 942, 964 (11th Cir. 2015).

The defendants are correct that there was little direct evidence of an agreement between Mr. Rix and Ms. Andreatta to engage in a scheme to defraud. Mr. Whitten offered somewhat-equivocal testimony that he believed Mr. Rix knew of the credit card use. Ms. Andreatta testified the opposite: that Mr. Rix did not know.

Yet there was circumstantial evidence of an agreement. Ms. Griner's and Ms. Richards's credit cards were used for personal purchases for the family, including car-loan and auto-insurance payments for cars that Mr. Rix drove. Mr.

18

Rix's card was used to purchase Carnival Cruise tickets and airline tickets for trips

he went on.[7] That card was also used to purchase Corvette parts that were shipped

to Mr. Rix, and he purchased Corvette tires in person with the corporate card.

When Mr. Whitten asked Mr. Rix to turn in his corporate credit card, the card was

in Mr. Rix's wallet, not in the office lockbox as the rules required. Finally, Mr.

Rix made $22.50 an hour, and Ms. Andreatta made between $10 and $16.50 an

hour. A reasonable jury could find that Mr. Rix would notice $466,692.41 in extra

family income over a six-year period.

From this circumstantial evidence, a jury could believe that Mr. Rix knew of

the scheme and voluntarily participated in it, thereby evincing an agreement with

Ms. Andreatta to achieve an unlawful objective. Drawing all inferences in favor of

the jury's verdict, this is sufficient to sustain a conviction for the conspiracy

charge. See United States v. Knowles, 66 F.3d 1146, 1155 (11th Cir. 1995) ("[T]he

existence of a conspiracy may [be], and often is, . . . proved by circumstantial

evidence, such as inferences from the conduct of the alleged participants or

from circumstantial evidence of a scheme." (quotation omitted)); see also United

States v. Jennings, 599 F.3d 1241, 1251 (11th Cir. 2010) (affirming conspiracy

conviction based on "a credibility call belonging to the jury" and participation by a

---

[7] Ms. Andreatta testified that Mr. Rix asked where the money came from for the cruise and that she told him it was an income tax refund.

19

conspirator "significantly past any point where he could convincingly claim ignorance").

### 2. Authority to Use Credit Cards

Ms. Andreatta argues the government did not sufficiently prove the aggravated identity theft charges because the evidence showed she was authorized to use Ms. Griner's and Ms. Richards's credit cards.

A conviction for aggravated identity theft requires proof that the means of identification of another person was used "without lawful authority." United States v. Pierre, 825 F.3d 1183, 1194 (11th Cir. 2016) (quotation omitted). The evidence supporting Ms. Andreatta's defense is mainly her own testimony that Mr. Whitten offered to help her financially in exchange for sex, and then approved the credit card payments she had made.

However, this evidence must be weighed against the evidence that Ms. Andreatta altered the credit card ledgers and purposefully took the credit card statements out of the mail before they got to Mr. Whitten. This evidence could support a finding that Ms. Andreatta wanted to conceal the payments from Mr. Whitten. Mr. Whitten's decision to call the police when he learned of the charges undercuts Ms. Andreatta's assertion that he'd given her permission to use the credit cards for her personal needs. And Ms. Andreatta's testimony is opposed by Mr. Whitten's testimony that he never had a sexual relationship with her and, more

importantly, that he never gave her authorization to use the credit cards.  Beyond that, Ms. Andreatta testified that she obtained a $6,000 loan from Mr. Whitten in February 2008, which she repaid through deductions from her paycheck.  She offered no explanation for why she required a loan from Mr. Whitten if she already had permission to make charges to company credit cards.

We must resolve issues of credibility and all other inferences in favor of the jury's verdict.  Vernon, 723 F.3d at 1266.  If the jury believed Mr. Whitten's testimony and disbelieved Ms. Andreatta's, then it could reasonably find she had no authorization.  Therefore the District Court correctly denied Ms. Andreatta's Rule 29 motion on these claims.

### 3.  Mr. Rix's Involvement

Mr. Rix argues the government did not sufficiently prove his knowledge and involvement in the scheme.  He challenges his conviction for all six substantive counts of wire fraud.

"The elements of wire fraud under 18 U.S.C. § 1343 are (1) intentional participation in a scheme to defraud and (2) use of the interstate wires in furtherance of the scheme."  United States v. Hasson, 333 F.3d 1264, 1270 (11th Cir. 2003).  "[T]o convict under a theory of aiding and abetting, the government must prove that (1) someone committed the substantive offense; (2) the defendant contributed to and furthered the offense; and (3) the defendant intended to aid in its

21

commission." United States v. Sosa, 777 F.3d 1279, 1292 (11th Cir. 2015). However, "a defendant may be convicted of mail fraud without personally committing each and every element of mail fraud, so long as the defendant knowingly and willfully joined the criminal scheme, and a co-schemer used the mails for the purpose of executing the scheme." United States v. Ward, 486 F.3d 1212, 1223 (11th Cir. 2007) (footnote omitted). This rule, which references mail fraud, applies with equal force to the crime of wire fraud. See United States v. Evans, 473 F.3d 1115, 1118 n.3 (11th Cir. 2006) (noting identical language in the mail fraud and wire fraud statutes allows courts to "borrow freely" from cases construing each statute).

Mr. Rix was convicted of conspiracy to commit wire fraud. That conviction required proof beyond a reasonable doubt that Mr. Rix intentionally participated in a scheme to defraud. See Maxwell, 579 F.3d at 1299. Under this Circuit's precedent, Mr. Rix is therefore vicariously liable for Ms. Andreatta's use of company credit cards to make non-business purchases. See Ward, 486 F.3d at 1225. Accordingly, sufficient evidence supports Mr. Rix's conviction on all six wire-fraud counts, whether or not the scope of the review is confined to the evidence presented in the government's case-in-chief. The District Court did not err in denying his motion for acquittal.

22

## III.  CONCLUSION

The District Court did not abuse its discretion in its evidentiary rulings, nor in its rejection of Ms. Andreatta's requested jury instruction.  As to the motions for a judgment of acquittal, because the jury evidently believed Mr. Whitten and did not believe Ms. Andreatta, there was sufficient evidence to convict.

**AFFIRMED.**