**Joel W. MARTIN, Plaintiff-Appellee,**

v.

**CITY OF NEW ORLEANS and David Michell, Defendants-Appellants.**

No. 81–3277.

United States Court of Appeals, Fifth Circuit.

June 25, 1982.

Rehearing and Rehearing En Banc Denied Aug. 11, 1982.

Herman L. Bastian, Jr., Deputy City Atty., Salvador Anzelmo, City Atty., Galen S. Brown, Deputy City Atty., New Orleans, La., for defendants-appellants.

Terrence J. Lestelle, New Orleans, La., Jacob J. Amato, Jr., Gretna, La., for plaintiff-appellee.

Before GOLDBERG, WILLIAMS and GARWOOD, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge.

In the early morning hours of October 6, 1979, plaintiff-appellee Joel Martin was walking through the French Quarter in New Orleans, Louisiana with his girlfriend, his brother, and a few of his brother's friends. He was standing on Bourbon Street at the corner of Bienville when suddenly he was struck in the back of the neck with what he later discovered to be a bullet from the revolver of New Orleans policeman David Michell, the defendant-appellant.

Martin filed suit against Officer Michell and the New Orleans Police Department alleging that Michell had acted negligently in allowing his gun to discharge in a crowded area. Because Michell was acting within the course and scope of his employment as a policeman, Martin alleged, the Police Department was vicariously liable for Michell's negligence. Jurisdiction was based upon diversity of citizenship because Martin was a citizen of Kentucky.

On the evening of October 5, 1979, Officer Michell had been patrolling the French Quarter. He received a report over his radio informing him that a late model red Pontiac was careening through the Quarter and had just struck a mounted policeman. Moments later Michell was at the intersection of Bourbon and Conti Streets when he noticed a red Pontiac proceeding recklessly down Conti. The vehicle nearly hit another policeman, Robert Williams, several pedestrians, and Officer Michell. The Pontiac continued down Conti and then turned right at the next corner onto Royal Street. Anticipating that the driver would take a route around the block, Michell ran up Bourbon Street toward Bienville Street to await the return of the Pontiac. As Michell had guessed, the vehicle turned right from Royal onto Bienville and headed back toward Bourbon Street. Standing on Bienville, just before the Bourbon Street intersection, Officer Michell, by gesture and by standing in the street, ordered the driver of the Pontiac to halt. The driver ignored Michell and continued straight ahead almost running him down. At this point in the story, Michell's account of the subsequent events differs from the account given by witnesses for Martin.

Michell testified that he jumped out of the car's path and ran around to the passenger side of the vehicle. When he had observed the Pontiac earlier, Michell thought he had seen two people in the car, but now he saw the driver only. He claimed that he then drew his revolver, approached the front passenger side door, and leaned into the window to see whether the other person was hiding in the back seat. The driver grabbed Michell's revolver and in their struggle, the gun went off.

Betsy Buie and Judy Moscovitc, two of Martin's companions that evening, were standing on Bourbon Street at the Bienville Street intersection just behind the Bourbon Street barricade when the incident took place. Although they were on the driver's side of the Pontiac, they testified that because they were behind the car, they could see clearly everything that happened on the passenger side. They contended that Michell approached the passenger side, drew his revolver, and using both hands, fired into the open window of the car. They stated unequivocally that Michell was standing completely outside of the car and that at no time did he lean into the car.

After the shot was fired, Martin grabbed the back of his head and sank to his knees. His testimony at trial indicated that at first he did not realize what had happened; he thought he might have been struck by a blunt object. But, almost instantly he was bleeding profusely. His companions rushed over to help him, but no one was able to stop the bleeding. A few minutes later, he was helped into a police squad car and taken to Charity Hospital.

Doctors at the hospital found that he had been shot and that the bullet and several bullet fragments had lodged in the soft tissue at the base of Martin's head and top of his neck. Because it was so close to the spinal cord, the doctors decided it would be too dangerous to remove the bullet. Martin had no other symptoms or complications at that time and was released from the hospital three days later.

Since the incident, Martin has experienced only minimal physical discomfort. Occasionally his neck becomes tired and sore when he remains in one position for a long time. He testified that he continues to suffer emotionally because he is constantly aware of the bullet's presence, and he fears the possibility of future complications.

Two neurosurgeons who had examined Martin testified as to the extent of his injuries and his prognosis. Both testified that Martin's injury was healing well without complications. Because the bullet and its fragments remained in his neck, how-ever, there would always be a risk of complications such as infection, arteriovenous fistula, and increased pain. If the bullet or fragments migrated to the spinal cord, Martin could become partially or totally paralyzed. Corrective surgery for any of these conditions would be dangerous and expensive. The doctors concluded that while the chance that Martin would experience these complications was small, the consequences were serious.

The case was submitted to the jury upon special interrogatories. They found that police officer Michell was negligent in the discharge of his gun and wounding of plaintiff, and that his negligence was a proximate cause of Martin's injury. Martin was awarded $500,000.00. The court entered judgment in that amount.

In this appeal, Michell contends that the court committed reversible error in refusing to submit his requested jury instruction concerning the sudden emergency doctrine as a defense to the claim of negligence. Alternatively, he argues that the $500,-000.00 award cannot stand because it is punitive, speculative, and unsupported by the evidence. We find his contentions unpersuasive and affirm on both issues.

## SUDDEN EMERGENCY DOCTRINE

Michell's first point on appeal is that the court erred in refusing to instruct the jury on the sudden emergency doctrine. That doctrine has been defined by the Louisiana Supreme Court in these words:

> One who suddenly finds himself in a position of imminent peril, without sufficient time to consider and weigh all the circumstances or best means that may be adopted to avoid an impending danger, is not guilty of negligence if he fails to adopt what subsequently and upon reflection may appear to have been a better method, unless the emergency in which he finds himself is brought about by his own negligence.

*Hickman v. Southern Pacific Transport Co.,* 262 La. 102, 262 So.2d 385, 389 (1972). Michell argues that the doctrine was applicable

to the facts of this case because recklessness of the driver of the automobile, including the attempt to run him down, put him into a position of imminent peril. Martin contends that Michell waived his right to appeal this issue because he failed to make a specific objection to the court's charge and, in the alternative, that the charge gave an instruction substantially equivalent to the sudden emergency doctrine. We find that the issue was not waived by Michell but that the court's charge sufficiently instructed the jury as to the applicable principles of law.

Prior to trial, both parties submitted proposed charges and special interrogatories to the court. Michell's Requested Jury Charge No. 7 contained the sudden emergency doctrine in the above-quoted language with a citation to the *Hickman* case. The court drew up its own charge and gave each party an opportunity to object to any alleged errors in the charge. Martin's counsel posed his objections first. He offered citations in support of his objections but the court refused to consider them saying "Don't give me any argument, just put your objection in, that will protect you." The court then asked Michell's counsel for his objections and he replied, "We would like to enter into the record our objection for the Court not using our jury charges one through nine."

We find Michell's blanket objection was sufficient to preserve an appeal from the court's failure to use his Requested Jury Charge No. 7. Fed.R.Civ.P. 51 requires that a party objecting to a proposed jury charge must state "distinctly the matter to which he objects and the grounds of his objection." The rule does not require formality; rather, its purpose is to inform the trial judge of his possible errors so that he may have a chance to correct them. *Kroger Co. v. Roadrunner Transportation, Inc.*, 634 F.2d 228, 229–30 (5th Cir. 1981); 5A Moore's Federal Practice, § 51.04 (1982). Here, the trial court told counsel that he would not listen to any argument and that merely stating an objection would be sufficient. Under these circumstances, we find that Michell's counsel adequately informed the court of his objection to its failure to include the sudden emergency doctrine in the charge. Therefore, the issue is properly before us in this appeal.

In reviewing alleged errors in jury charges, we must look at the charge as a whole to determine whether it fairly and adequately apprised the jury of the applicable law and its duty to resolve the issues thereunder. *Smith v. Borg-Warner Corp.*, 626 F.2d 384, 386 (5th Cir. 1980). If the charge leaves the reviewing court with "substantial and ineradicable doubt as to whether the jury has been properly guided in its deliberations" it cannot stand. *Dwoskin v. Rollins, Inc.*, 634 F.2d 285, 293 (5th Cir. 1981). A party does not have a right to have any particular charge read to the jury even if its requested charge is a correct statement of the law. *Ullman v. Overnite Transportation Co.*, 563 F.2d 152, 157 (5th Cir. 1977). And when a specific instruction requested by a party is substantially covered by the court's charge, there is no error. *McCullough v. Beech Aircraft Corp.*, 587 F.2d 754, 759 & n.9 (5th Cir. 1979). Having reviewed the entire charge we find that, in its own words it adequately instructed the jury on the issue of sudden emergency.

The doctrine of sudden emergency does not invoke a different standard of care than that applied in any other negligence case. The conduct required is still that of a reasonable person under the circumstances. The emergency is merely a circumstance to be considered in assessing the actor's conduct. W. Prosser, *Law of Torts*, Ch. 5 § 33 at pp. 168–70 (1971). As the Louisiana Court of Appeals has explained, "This characterization lends little or nothing to the determination of negligence and in no way modifies the standard tests. Sudden emergency is certainly no absolute defense and we must still ask the question: 'Was the conduct in question reasonable under the circumstances?' At most, reference to 'sudden emergency' serves to emphasize 'under the circumstances.'" *Dean v. Travelers Insurance Co.*, 171 So.2d 708, 709 (La.App. 1965) (finding that a person acted negli-

gently in letting go of the steering wheel even though she had been confronted with a sudden emergency). *Accord, Jackson v. Indiana Lumbermen's Mutual Insurance Co.,* 175 So.2d 349, 350 (La.App.1965). *Cf. Hickman,* 262 So.2d at 389 (motorcyclist acted reasonably when confronted by a sudden emergency not brought about by his own negligence).

■ We find that the court below adequately charged the jury on this issue. Although it never spoke in terms of "emergency" or "imminent peril," the court instructed the jury to consider all the surrounding circumstances when determining whether Michell's conduct was negligent. The jury was told that negligence is "the failure to use ordinary care under the circumstances" and that "ordinary care is not an absolute term, but a relative one. That is to say, in deciding whether ordinary care was exercised in a given case, the conduct in question must be viewed in the light of all the surrounding circumstances, as shown by the evidence in the case."

The jury had heard the testimony from three policemen concerning the dangers posed by the reckless driver of the Pontiac. Two of Martin's witnesses testified that the driver did indeed try to run down Michell. This evidence was undisputed. Further, Michell testified that he leaned into the car in an attempt to stop the driver and that the driver grabbed his gun. Thus, all of the facts giving rise to the emergency [1] were before the jury and the jury was instructed to evaluate Michell's conduct in light of these circumstances. Arguably, a specific charge on the doctrine of sudden emergency would have been preferable. Our duty as an appellate court, however, is to ensure that the charge is fair and adequate. We conclude that the charge met this standard.

## THE AWARD

Michell contends that the $500,000 award was speculative, punitive, and excessive in light of the evidence. He asks us to reverse the judgment or, in the alternative, to order a remittitur. We hold that the award was neither speculative nor punitive. Nor do we find it excessive, requiring reversal or remittitur.

■ Under Louisiana law, the right of recovery in personal injury cases is limited to actual and compensatory damages and does not extend to speculative or punitive damages. *Breaux v. Simon,* 235 La. 453, 104 So.2d 168 (1958). Michell asserts, with absolutely no factual elaboration, that the $500,000 award was speculative and punitive. There is no indication that this is the case. Martin never requested punitive or speculative damages, and his counsel's argument did not suggest that such an award would be proper. The trial court specifically instructed the jury that the award could not be punitive or speculative and that the damages had to be established by reasonable, credible evidence, not by remote or speculative proof. The court listed the items for which Martin could recover as including (1) physical pain and suffering, past and future; (2) mental anguish and mental suffering, past and future; (3) permanent residual disability; and (4) reasonable medical expenses, past and future. We find the jury was adequately instructed as to punitive and speculative damages, and we find no grounds for reversal on this issue.

■ Michell then argues that the award was excessive. He asks us to reverse the judgment or order a remittitur. It is firmly established that an appellate court will not reverse a jury verdict for excessiveness except on "the strongest of showings."

1. Martin also argues that the doctrine is inapplicable to the facts of this case as a matter of law. He contends that there was no emergency until Michell negligently threw himself in front of, and then into, the Pontiac. Because the doctrine can not apply to one who negligently brings about the perilous situation, *Hickman,* 262 So.2d at 389, the court, it is argued, was correct in refusing to instruct the jury on the doctrine. We need not consider the merits of this argument, however, because we conclude that the court's charge conveyed to the jury the essence of the sudden emergency doctrine, although not in the words requested by Michell.

*Bridges v. Groendyke Transport, Inc.*, 553 F.2d 877, 880 (5th Cir. 1977). Because the size of the award is primarily a question of fact, we are exceedingly hesitant to overturn the decision of a jury, especially when the trial judge has approved the award. *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 933 (5th Cir. 1982). We will reverse an award for excessiveness only when it is "so gross ... as to be contrary to right reason," *Bailey v. Southern Pacific Transportation Co.*, 613 F.2d 1385, 1391 (5th Cir. 1980), *cert. denied*, 449 U.S. 836, 101 S.Ct. 109, 66 L.Ed.2d 42 (1980), or when it "clearly exceeds that amount that *any* reasonable man could feel the claimant is entitled to." *Shows, supra* at 934 quoting *Bridges, supra* at 880 (emphasis in original). Even if we strongly disagree with the amount of the award, we may not reverse it as long as it meets these standards. *Shows, supra* at 934.

Michell contends that a review of the evidence shows that the $500,000 award was clearly excessive. In support of his argument he emphasizes the following evidence: (1) Martin's medical expenses totalled only $391.46; (2) no surgery was performed and none was indicated at the time of trial; (3) Martin has lost no wages as a result of the injury; (4) Martin experiences only minor physical discomfort; (5) his prognosis was generally good; (6) he has experienced no complications since the injury; and (7) his neurological exams were normal.

But, as Martin points out, that was not all the evidence. There was medical testimony concerning the adverse psychological effects experienced by people who retain foreign objects, such as glass or bullets, in their bodies after an accident. Martin testified that he is constantly aware of the presence of the bullet and fearful of future complications. And, while the doctors did state that Martin's prognosis was good, they also testified that there would always be some risk of future complications, and

that the consequences could be life-threatening. Because he has only one day in court, he must collect now for any losses that may occur in the future. The relatively small amount of medical expenses incurred by Martin has little bearing standing alone. In this case, there was persuasive reason for low medical expense; the reason Martin did not incur the expense of surgery was because surgery was considered to be too dangerous. Thus far, given the nature of the injury, Martin has been fortunate. His wound healed normally and he has not suffered serious physical disabilities as a result of the injury. Still, Martin must go through life (he is in his 20s) with a bullet lodged in the back of his neck, a fraction of an inch from his spinal cord. In light of this emotional burden and the serious physical risks he will always have, we cannot say that $500,000 is "contrary to right reason," *Bailey, supra* at 1391, or in excess of the amount that "*any* reasonable man could feel [Martin] was entitled to." *Shows, supra* at 934. Because we find that the verdict was not excessive, we do not reverse or reduce it.

## CONCLUSION

The court below adequately instructed the jury on all the relevant issues, including the sudden emergency doctrine. We hold that the verdict is not excessive in light of the evidence. The judgment of the district court is

AFFIRMED.

GARWOOD, Circuit Judge, dissenting:

I respectfully dissent. In my opinion the trial court committed reversible error in refusing defendant's request for an instruction on sudden emergency. It is undisputed that the requested instruction was a fair and correct statement of the applicable Louisiana law, and it is clear from the facts recited in the majority opinion that the question of sudden emergency was raised by the evidence.[1]

1. As observed in footnote one of the majority opinion, appellee contends that the sudden emergency charge would have been improper

because the doctrine does not apply to one who negligently brings about the perilous situation. This matter was covered in the requested in-

The majority opinion rests on the theory that the general charge adequately covered the matter because it contained the standard definitions that negligence was "the failure to use ordinary care *under the circumstances*" and that ordinary care "must be viewed in the light of *all the surrounding circumstances*" [emphasis added]. Of course, such or similar general definitions are given in nearly every negligence case, whether or not there is any question of sudden emergency. The majority opinion is therefore in effect holding that a sudden emergency instruction need *never* be given.

The majority rationale is that conceptually a sudden emergency is a circumstance, and hence is adequately covered by a plain vanilla "under the circumstances" charge. A certain logical force here cannot be doubted, but, to borrow long familiar phrases, "[u]pon this point a page of history is worth a volume of logic," *New York Trust Co. v. Eisner*, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921), or, as Justice Holmes said on another occasion, "[t]he life of the law has not been logic: it has been experience." O. Holmes, The Common Law (1881).

In *Hickman v. Southern Pacific Transport Company*, 262 La. 102, 262 So.2d 385, 389 (1972), the Louisiana Supreme Court, in discussing the sudden emergency doctrine, correctly observes that:

"The principle embodied in this rule enjoys *almost universal acceptance in the courts of the nation, founded* as it is *upon* common sense and a *proper recognition of prudent standards in human conduct.* 65A C.J.S. Negligence § 123; 57 Am. Jur.2d, Negligence, § 90. The rule applies to the defendant's as well as the plaintiff's conduct; it is therefore, *appropriate in a consideration of fault* as it bears upon contributory negligence." [Emphasis added.]

The court in *Hickman* decided the case before it expressly upon this doctrine: "Applying the doctrine of sudden emergency to Iles' [plaintiff's] conduct, we conclude . . . Iles was not, therefore, contributorily negligent." [*Id.* at 389.] Other Louisiana cases are similar. For example, in *McMullan v. Allstate Insurance Company*, 242 So.2d 921 (La.App. 1st Cir.), *writ denied*, 257 La. 990, 244 So.2d 859 (1971), the trial court ruled in favor of the defendant because it "found that both drivers were faced with a sudden emergency, acted accordingly, and were not negligent." [*Id.* at 923.] On appeal, the judgment was affirmed, the court quoting with approval from the opinion in *Bautista v. Maryland Casualty Company*, 201 So.2d 122, 124 (La.App. 4th Cir. 1967), in part as follows:

" '. . . similar to the doctrine of last clear chance, or discovered peril, sudden emergency is *an element of the law of negligence* which may be *considered and evaluated by the trier of fact* in reaching a conclusion relative to the standard or degree of care required of the defendant and the breach thereof under the individual facts of the particular case.' " [242 So.2d at 924; emphasis added.][2]

---

struction. Under the evidence here, whether Michell was negligent and, if so, whether the sudden emergency was caused by such negligence were clearly fact questions for the jury. Accordingly, appellee's contentions in this regard present no justification for the trial court's refusal to instruct on sudden emergency. *See Long v. Hank*, 457 F.2d 40 (10th Cir. 1972).

**2.** In *Alvis v. Davis*, 295 So.2d 48 (La.App. 2d Cir.), *writ denied*, 295 So.2d 446 (1974), the "trial court found that defendant was confronted with a sudden emergency, that he reacted reasonably in the face of the situation, and thus was not negligent." [*Id.* at 49.] The judgment was affirmed, and the court quoted with approval from the *Bautista* opinion, including the passage set out above in the text. [295 So.2d at 50.]

In *Fontana v. State Farm Mut. Auto. Ins. Co.*, 173 So.2d 284 (La.App. 3d Cir.) *writ denied*, 247 La. 1027, 175 So.2d 644 (1965), the court, in an opinion by Judge Tate, now of this Court, held that sudden emergency was a defense which had to be affirmatively pleaded. The courts in *Bautista*, *McMullan* and *Alvis* have rejected this view, holding that sudden emergency, like discovered peril, can come in under a general denial. So far as the writer has discovered, the Louisiana Supreme Court has not resolved this dispute. In federal court, the doctrine need not be specially pleaded. *Hopkins v. Metcalf*, 435 F.2d 123 (10th Cir. 1970).

As "sudden emergency" is an old doctrine almost universally accepted in negligence cases by the courts of Louisiana and the rest of our nation, we must assume that experience has proved its utility to judges and juries in the disposition of these cases. While in a conceptual or theoretical sense, the general "under the circumstances" rubric may be broad enough to encompass "sudden emergency," it is evident that in the practical task of deciding negligence cases it has been found helpful and useful, to both fact finders and law appliers, to group in a separate, special class those cases which involve sudden emergencies. Such an emergency is, of course, a circumstance, but it is one that experience teaches is sufficiently different from other classes of circumstances to warrant, as a practical matter, the special focus and highlighting which is afforded by the doctrine of sudden emergency. It aids the process of decision making for the judge and jury to be cautioned *to pause a minute and in effect* remind themselves, if this is a sudden emergency then we should not expect from the actor quite as much as we normally would, because this is a *special* circumstance.

I am aware of no decision of this Court holding that, where it is raised by the evidence and proper under applicable law, a requested sudden emergency charge need not be given. Opinions in other circuits seem to point in a contrary direction. In *Hopkins v. Metcalf*, 435 F.2d 123 (10th Cir. 1970), the trial court was reversed for failure to instruct on sudden emergency. In *Chandler v. Edgar W. Long, Inc.*, 623 F.2d 1139, 1141 (6th Cir. 1980), the court stated:

"We conclude that this testimony presented questions of fact for the jury to determine which *required* the trial judge to instruct the jury on the law of sudden emergency." [Emphasis added.]

**3.** *See also, e.g., Starns v. Jones*, 500 F.2d 1233, 1236–37 (8th Cir. 1974); *Cavallaro v. Williams*, 530 F.2d 473, 478 (3d Cir. 1975); *Long v. Hank*, 457 F.2d 40 (10th Cir. 1972); 3 Devitt and Blackmar, Federal Jury Practice and Instructions § 80.27 (3d ed. 1977).

**4.** *See, e.g., McCullough v. Beech Aircraft Corp.*, 587 F.2d 754, 759 n. 9 (5th Cir. 1979);

In *Sanchez v. Safeway Stores*, 451 F.2d 998, 1000 (10th Cir. 1971), the opinion contains the following in regard to a sudden emergency instruction: "In our opinion, the instruction was *required* by the evidence and was properly given." [Emphasis added.] [3]

The centerpiece of the defense in this case was sudden emergency. By refusing to instruct on this subject, the trial court, in effect, prevented the defense from having its theory of the case adequately presented to the jury.

Our decisions have long recognized that "In a proper case, a party may be entitled to have his theory submitted to the jury, when there is evidence to support it and a proper request therefor has been made." *Paramount Film Distributing Corp. v. Applebaum*, 217 F.2d 101, 123 (5th Cir. 1954), *cert. denied*, 349 U.S. 961 [75 S.Ct. 892, 99 L.Ed. 1284] (1955).

Of course, no party has a right to dictate the precise words the trial judge shall use in charging on a given subject or theory, nor to insist that although the trial judge has instructed on the principle involved in his own language, he must also do so again in the words of the party's requested instruction. [4] But these salutory, common sense rules do not extend so far as to excuse the trial judge, in the face of a proper request, from giving *any instruction* whatsoever on the party's theory, if raised by the evidence. Nor can the trial judge fulfill his obligation in this regard by simply charging in the usual boilerplate generalities. The following opinions of this Court clearly recognize these rules.

In *Bolden v. Kansas City Southern Railway Company*, 468 F.2d 580, 581 (5th Cir. 1972), this Court said:

"Because the instructions given by the district court covered the principles contained in the refused instructions and were less confusing to the jury than they would have been had the requested instructions been given, the district court did not err in refusing to give the instructions."

"A refusal to give a properly requested instruction supported by the pleadings and the evidence is also error. *Paramount Film Distrib. Corp. v. Applebaum*, 217 F.2d 101 (5th Cir., 1954). It is not error, however, for the court to refuse the *precise* wording of a requested instruction if its *substance* has been adequately covered by the court's charge to the jury." [Emphasis added.]

And the following appears in Judge Rives' opinion for the Court in *Lind v. Aetna Casualty And Surety Company*, 374 F.2d 377, 380 (5th Cir. 1967):

"If the requested instruction in accord with a party's contention is consistent with the evidence in the case, it *must* be granted unless *the subject matter* has been adequately covered in the court's charge. *Richardson v. Walsh Const. Co.*, 3 Cir., 1964, 334 F.2d 334. Judge Brown pointed out in this Circuit's decision in *Marshall v. Isthmian Lines, Inc.*, 5 Cir., 1964, 334 F.2d 131, that ' * * * it was *not enough to leave the whole thing within the vague contours of a general charge* with the inescapable *boiler-plate instructions on negligence* and the like' ...." [Emphasis added.]

In *United States v. Lewis*, 592 F.2d 1282, 1286 (5th Cir. 1979), approximately the same thought is expressed as follows:

"We have repeatedly held that 'a defendant is entitled to a charge which precisely and specifically, rather than merely generally or abstractly, points to the theory of his defense', *United States v. Wolfson*, 5 Cir., 1978, 573 F.2d 216, 221; *United States v. Gilbreath, supra*, 452 F.2d [992] at 994; *Perez v. United States*, 5 Cir., 1961, 297 F.2d 12, 16."

Here we have no dispute over precise wording, rather the trial court's instructions wholly failed to touch upon the sudden emergency doctrine in any manner whatsoever. The substance, subject matter and principle of the defendant's theory of the case—sudden emergency—was entirely omitted from the charge. The defendant was relegated to having his theory of the case left "within the vague contours of a general charge" and the "boiler-plate instructions on negligence." As reflected in the cited opinions of Judges Brown and Rives, this "was not enough."

In *United States v. Goss*, 650 F.2d 1336 (5th Cir. 1981), this Court held it was reversible error in a mail fraud case to fail to instruct on good faith. The reasoning of that opinion is applicable here:

"The trial judge did charge the jury that a finding of specific intent to defraud is required for conviction. The government urges us to find this sufficient to encompass the good faith defense. Indeed, the trial judge relied on *United States v. Wilkinson*, 460 F.2d 725, 729 (5th Cir. 1972), for the proposition that the giving of the specific intent instruction renders the good faith charge unnecessary.

"*Wilkinson* will not support the weight thus rested on it. In that mail fraud prosecution, the trial judge in fact gave an instruction incorporating the good faith defense, although he refused to couch that instruction in the language of the charge offered by the defendant. Thus, *Wilkinson* does not hold that, if a charge with respect to specific intent is given, then a jury instruction on the defense of good faith is unnecessary. Charging the jury that a finding of specific intent to defraud is required for conviction, while it may generally constitute the negative instruction, *i.e.*, that, if the defendants acted in good faith, they could not have had the specific intent to defraud required for conviction, does not direct the jury's attention to the defense of good faith with sufficient specificity to avoid reversible error." [650 F.2d at 1345.]

Of course, both *Lewis* and *Goss* were criminal cases, but the parties are no less entitled to instructions fairly presenting their theory of the case in civil actions, assuming proper request and adequate support in the evidence.

Since sudden emergency was plainly raised by the evidence and a proper instruction was requested, I would hold that the

trial court committed reversible error by failing to in any way touch on this subject, which was central to defendant's theory of the case, in its instructions.