Dale **GAUTREAUX**, Plaintiff-Appellee,

v.

**INSURANCE COMPANY OF NORTH AMERICA and McDermott Incorporated, Defendants-Appellants.**

No. 85–3737.

United States Court of Appeals, Fifth Circuit.

March 9, 1987.

John Nesser, III, Patricia A. Krebs, New Orleans, La., for defendants-appellants.

Michael X. St. Martin, Denis J. Gaubert, III, Houma, La., for plaintiff-appellee.

Before WILLIAMS, JOLLY and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The appellee, Dale Gautreaux, brought this Jones Act suit for injuries he sustained while working as the acting leaderman of a construction rigging crew on a barge owned by the appellant, McDermott Incorporated ("McDermott"). A jury found McDermott negligent but also found Gautreaux contributorily negligent to the extent of fifty percent. In a general verdict, the jury assessed Gautreaux's damages at $483,000. The trial court entered judgment in favor of Gautreaux for $241,500. The appellants McDermott and Insurance Company of North America now contend that (1) the trial court erred by not submitting their proposed jury instructions on Gau-

treaux's work experience and the "sudden emergency doctrine"; (2) the evidence is insufficient to support the jury's finding of McDermott's negligence; and (3) the jury's assessment of damages is excessive. Finding no reversible error, we affirm the trial court on the first two issues. However, because we cannot find sufficient evidence in the record to support the full amount of the general verdict, we remand to the district court for a new trial on the issue of damages.

## I

At the time of the accident, McDermott, an offshore construction company, employed Gautreaux as a leaderman, in a temporary capacity, on McDermott Derrick Barge 16. Gautreaux was second in command of a construction rigging crew and the deck foreman, Larry Spivey, was first in command. Gautreaux and two crew members were rigging lines from a steel sling to a deck section. Wire cable was available, but Gautreaux ignored the suggestion of one rigger to use the cable to lift the heavy sling. Instead, he instructed the crew members to use a ¾ inch manila rope to tie the steel sling to the crane boom. Gautreaux then ordered the crane operator to raise the sling. With the sling raised to a height of approximately twenty feet, the crew tried to align the shackle of the sling over a padeye welded on the deck section. They tied ropes, or "dog lines," from the eye of the sling to the deck section, but their attempts to align the sling failed. Gautreaux radioed Spivey for assistance. Spivey arrived and ordered one crew member out of the access hole directly under the sling. Under Spivey's direction, the crew began securing more dog lines from the eye of the sling to the deck. The dog lines were attached to prevent the sling from falling through the access hole if the manila rope were to break. Spivey then directed Gautreaux to radio the crane operator and instruct him to raise the sling four or five inches. Gautreaux relayed the message.

At trial, the crane operator testified that he never received Spivey's instruction and did not raise the sling. Gautreaux and another crew member testified, however, that after Gautreaux radioed Spivey's order, the dog lines tightened, indicating that the sling had been lifted. In any event, the manila rope tightened and broke. The sling fell to the deck striking Gautreaux and a second crew member.

Gautreaux suffered knee injuries including a torn major ligament that required surgery. After the surgery, Gautreaux suffered from chondromalacia, a form of posttraumatic arthritis. One year after the accident, Gautreaux's physician performed an arthroscopic examination of the knee and surgically shaved the injured knee surfaces. Two years after the accident at the time of the trial, Gautreaux was still receiving at least some physical therapy and had not returned to work.

At trial, Gautreaux's physician testified that permanent partial disability to the knee totaled twenty-five percent. The appellants' orthopedic specialist testified that the permanent partial disability to Gautreaux's knee totaled forty percent. Although both physicians agreed that Gautreaux could begin working as a crane operator or in a similar capacity by May 1985, they both advised against permitting Gautreaux to perform labor that would involve repetitive stooping, lifting, standing, squatting, or climbing.

Gautreaux introduced the testimony of an expert economist who calculated Gautreaux's lost meals and wages resulting from the injury to be $382,493.26. In calculating Gautreaux's past and future wage loss, the expert used a leaderman's salary of $11.96 an hour. Because the evidence showed that Gautreaux was to be demoted to relief crane operator shortly after the accident, the appellants' counsel, on cross-examination, requested that the expert recalculate Gautreaux's total wage loss using a relief crane operator's salary of $9.35 per hour. The expert arrived at a new figure of $303,664.14 that represented total lost meals and wages.

In closing argument, Gautreaux's counsel asked the jury to award $383,000 for total wage and meal loss and $100,000 for pain and suffering. The jury returned a general verdict finding that (1) McDermott was liable; (2) Gautreaux was fifty-percent contributorily negligent; and (3) Gautreaux was entitled to $483,000 in damages.

## II

The appellants contend that the trial court's jury instructions were erroneous in two respects. First, they argue that the trial court failed to properly instruct the jury regarding Gautreaux's twenty years of offshore work experience and that Gautreaux was therefore subject to a standard of care higher than that of an ordinary Jones Act seaman. Second, they argue that the trial court should have instructed the jury on the "sudden emergency doctrine." We find no merit to either contention.

### A.

■ With respect to Gautreaux's work experience, the appellants allege that the trial court gave a "boiler-plate" Jones Act negligence charge which misled the jury into believing that Gautreaux was held only to the slight standard of care required of an ordinary Jones Act seaman.[1] The trial court charged the jury, "In your consideration of the claims and defenses of the parties, you may consider the experience, expertise, and work history of the individuals involved in light of the legal principles that follow." Record, Vol. VI at 313. This language apprised the jury that it could consider Gautreaux's work experience and

conveyed the substance of the appellants' proposed instruction. The district court's refusal to give the charge in the particular language chosen by the appellants is not error. *Freimanis v. Sea-Land Services, Inc.*, 654 F.2d 1155, 1163–64 (5th Cir.1981).

### B.

The appellants next contend that the trial judge erroneously failed to instruct the jury on the "sudden emergency doctrine." As defined by the Louisiana Supreme Court, that doctrine applies if an actor finds himself in a position of imminent peril and lacks sufficient time to evaluate the danger confronting him. In such situations, the actor is not guilty of negligence if he fails to "adopt what subsequently and upon reflection may appear to have been a better method, unless the emergency in which he finds himself is brought about by his own negligence." *Hickman v. Southern Pacific Transport Co.*, 262 La. 102, 262 So.2d 385, 389 (1972).

The appellants argue that the doctrine of sudden emergency applies in this case because Spivey faced an emergency situation that was not created by his own negligence; rather, it was created by Gautreaux's negligent use of the manila rope. They therefore argue that the jury should have been instructed on the emergency facing Spivey. Their proposed jury instructions included the following: "Thus, if you find that Larry Spivey came upon a dangerous situation which necessitated immediate action, you must weigh his conduct by a different standard from that of a person in a non-emergency situation." Defendants' Jury Charge No. 13.

1. The appellants' proposed jury instructions on Gautreaux's work experience included:

Where an experienced offshore worker, previously second in command of his vessel, chooses to use a single line of rope to lower heavy equipment instead of doubling or tripling the line, any injury to him caused by the rope breaking has been held to be a result of his sole negligence. I charge you that for the same reasons, if you find that Mr. Gautreaux's injuries resulted from his decision to use manila rope instead of available wire rope, or to use a single line of manila rope rather than

double or triple it, you should find that Mr. Gautreaux's accident was caused by his sole negligence.

Defendants' Jury Charge No. 7. In essence, adopting this proposed instruction would have put the court in the position of arguing the appellants' case before the jury. The appellants' counsel was free to argue experience and the "sudden emergency doctrine" to the jury; indeed, that is what counsel is paid to do. However, it is inappropriate to expect the court to argue one's case through specific jury instructions.

The appellants' proposed instruction misstates the law. This court held in *Martin v. City of New Orleans*, 678 F.2d 1321 (5th Cir.1982), that the doctrine of sudden emergency does not invoke a different standard of care than that applied in any other negligence case. The conduct required is still that of a reasonable person under the circumstances. *Id.* at 1325; *see also* W. Prosser, *Law of Torts*, § 33 at 168–70 (1971).

In *Martin*, a negligence action was brought against the City of New Orleans and one of its police officers. Because the officer's disputed conduct occurred during a perilous situation, the defendants requested a jury instruction on the doctrine of sudden emergency. The trial court, however, gave a general negligence instruction. A panel of this court held that the trial court adequately instructed the jury to consider the emergency situation and that the general definition of negligence substantially covered the requested charge. *Martin*, 678 F.2d at 1325–26. The court reasoned that the jury had heard sufficient testimony and was well aware of all facts giving rise to the emergency facing the police officer in that case.

■ Similarly in this case, the trial court gave a general definition of negligence. As in *Martin*, the jury was well aware of the serious danger present on Derrick Barge 16 when the accident occurred. The charge, although not expressed in the appellants' language, adequately conveyed the essence of the requested instruction and is not reversible error. *Id.; McCullough v. Beech Aircraft Corp.*, 587 F.2d 754, 759 & n. 9 (5th Cir.1979).

### III

■ The appellants also argue that the evidence presented at trial was insufficient to support the jury verdict of negligence on the part of McDermott. The appellants base this argument on testimony given by the crane operator who claimed that he never received Spivey's instruction to raise the sling. They argue that Spivey's order to raise the sling was not acted upon and therefore Spivey's conduct cannot be the proximate cause of Gautreaux's injuries. According to the appellants, Gautreaux's own negligence in using a manila rope rather than the available wire rope was the sole cause of the accident and his resulting injuries. They conclude that the jury's finding of negligence on the part of McDermott was not supported by the evidence and must be reversed.

We cannot accept the appellants' argument. The appropriate standard of review for this court to test the sufficiency of the evidence in a Jones Act case is whether there is a reasonable evidentiary basis for the jury's verdict. *E.g., Thezan v. Maritime Overseas Corp.*, 708 F.2d 175, 181 (5th Cir.1983), *cert. denied*, 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984). If such a basis exists, this court's function is exhausted. *Id.* The jury found Gautreaux to be fifty-percent contributorily negligent. Thus, it is clear that the jury considered the appellants' evidence and accepted the theory that Gautreaux was negligent, but found that his negligence was only partially the cause of the accident.

Based on the remaining evidence, the jury could have reasonably concluded that Spivey was also negligent and that his negligence was partially responsible for the accident. The evidence clearly shows that although Gautreaux was originally responsible for rigging and lifting the sling, Spivey took control of the project. With the sling raised approximately twenty feet, Spivey instructed the men to attach additional dog lines. Spivey testified that he considered the situation dangerous and was concerned about the safety of his crew. He did not, however, clear the area of all crew members and did not instruct the crane operator to lower the sling in order to relieve tension on the rope. The jury could have reasonably concluded that Spivey's conduct added to the danger and that he acted negligently.

There was conflicting evidence whether the crane operator raised the sling after Spivey took command. The crane operator testified that he never received Spivey's order, and he therefore did not raise the

sling. Gautreaux and another crew member, however, testified that the dog lines tightened after Gautreaux radioed Spivey's order to raise the sling. This would indicate that the sling was raised pursuant to the order. It is within the jury's province to weigh conflicting testimony, and as long as there is evidence supporting the verdict, it will be upheld. *Conan Properties, Inc. v. Conans Pizza, Inc.,* 752 F.2d 145, 149 (5th Cir.1985). The jury could have reasonably concluded that the rope broke because the operator raised the sling following Spivey's order.

This evidence provides a reasonable evidentiary basis for the jury's verdict. The trial court did not abuse its discretion by denying the defendants-appellants' motion for a new trial.

## IV

The appellants' final argument is that the jury's general verdict awarding Gautreaux $483,000 is excessive. They contend that the evidence presented concerning Gautreaux's physical condition and his ability to work does not support such a large award.

Absent a definite finding of error, this court is not at liberty to reverse the jury's award. *Pellegrin v. McDermott,* 504 F.2d 884, 885 (5th Cir.1974); *Gorsalitz v. Olin Mathieson Chemical Corp.,* 429 F.2d 1033, 1043–47 (5th Cir.1970), *modified,* 456 F.2d 180 (1972), *cert. denied,* 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807 (1972). Because the jury rendered a general verdict, which does not distinguish between the various components of the damages, we are at a disadvantage in reviewing this award. *Allen v. Seacoast Products, Inc.,* 623 F.2d 355, 365 (5th Cir.1980). Notwithstanding the general verdict rendered in this case, we must apply the circuit's "maximum recovery rule" in reviewing the award. That is, we must determine the maximum amount the jury could have properly awarded, based on the evidence in this record. *E.g., Dixon v. International Harvester Co.,* 754 F.2d 573 (5th Cir.1985).

The record shows that the accident occurred on July 20, 1983. Gautreaux suffered from a torn major ligament in the knee, which was surgically corrected about five days after his accident. His surgeon, Dr. Landry, also repaired torn cartilage in the knee at this time. Gautreaux was hospitalized for approximately three days.

During the postoperative period, Gautreaux wore a cast from his toes to his hip. After the cast was removed, Gautreaux had physical therapy every day, but, shortly thereafter, this therapy was decreased to a few times a week. After August 1983, Gautreaux returned to his orthopedist for physical therapy about every two or three weeks. His recovery apparently progressed normally.

In August 1984, however, Gautreaux complained of increasing pain. Dr. Landry performed an arthroscopic examination of the knee joint and discovered that the undersurface of the kneecap was affected by chondromalacia, a softening of the cartilage in the joint, which was associated with his earlier injury. Dr. Landry shaved down the undersurface of the kneecap. Gautreaux continued to receive physical therapy after Dr. Landry performed this surgical procedure. His recovery progressed normally, and in May 1985 his doctor determined that he was fit to return to work, so long as the work was on shore.

At the time of the trial, September 30, 1985, Dr. Landry's prognosis was that Gautreaux would have twenty-five percent permanent partial physical impairment of the leg as well as continued pain under the kneecap resulting from the chondromalacia. In Dr. Landry's opinion, it was probable that Gautreaux would suffer from post-traumatic arthritis, which could eventually necessitate more surgical shaving or, in the most extreme case, surgical removal of the kneecap and a repositioning of the knee joint.

On cross-examination, Dr. Landry testified that Gautreaux had reached a maximum plateau of recovery in May 1985 and at that time was fit to operate a crane, either on shore or offshore. Dr. Landry

would not, however, permit Gautreaux to do repetitive climbing, jumping, walking on beams, or manual labor that would require constant stooping, bending, and lifting. Dr. Landry also warned that it would not be safe for Gautreaux to disembark from a crewboat to an offshore job site on a barge during bad weather and rough sea conditions.

The appellant's expert surgeon, Dr. Senac, testified that the results of Gautreaux's surgery were excellent, and he foresaw no medical probability that further surgery would be required. Dr. Senac, however, estimated Gautreaux's permanent disability of the knee at forty percent. Notwithstanding this disability, Dr. Senac testified that Gautreaux could have returned to work either on shore or offshore in April 1985 as a barge foreman, crane operator, relief crane operator, cherry picker or some other kind of heavy equipment operator. Like Dr. Landry, Dr. Senac would not permit Gautreaux to engage in heavy labor, jumping from barge to barge, or heavy climbing.

McDermott put on no evidence to rebut the suggestion, and it is apparently undisputed, that jumping from barge to barge and disembarking during bad weather from a crewboat to a job site on a barge was not a requirement of offshore duty. Thus, from the medical evidence introduced at trial, the jury could have reasonably determined that Gautreaux was not fit to return to offshore duty.

■ The jury awarded Gautreaux $483,000 that compensated him for pain and suffering, past and future lost meals that McDermott would have provided had he continued working offshore, and past and future lost wages. Based on the evidence in the record, we apply the maximum recovery rule to each of these components, and now hold that the maximum amount the jury could have awarded Gautreaux for his pain and suffering was $100,000. This is the maximum amount that Gautreaux's counsel requested in closing argument, and any greater amount would have been unsupported on the record in this case.

■ Dr. Goodman, Gautreaux's expert economist, presented testimony regarding the value of Gautreaux's past and future lost meals while working offshore. He testified that the value of past lost meals was $10,414.00, and that the value of future lost offshore meals for 21.8 years following the accident totaled $61,944.87. McDermott offered no evidence to refute the value of the offshore meals. Thus, based on the evidence adduced, we hold that $72,358.87 is the maximum award possible for all offshore meals lost; this figure includes compensation for both past and future meals.

■ With respect to Gautreaux's past lost wages, Dr. Goodman testified on direct examination that past wage loss was $48,134.54. This figure was based on Gautreaux's salary as a leaderman at $11.96 per hour.[2] The record shows, however, that Gautreaux would have been demoted within a short number of days after his accident to relief crane operator and would have earned $9.35 per hour. On cross-examination, Dr. Goodman recalculated Gautreaux's past lost wages at $9.35 per hour. The new total was $39,444.17, and we hold that this is the greatest amount the jury could have awarded for past wage loss.

Determining the maximum amount awardable for future wage loss presents a more difficult problem. Again, when calculating future wage loss, Dr. Goodman used a leaderman's salary. He computed future wages at $11.96 per hour and subtracted from this figure the future wages of an employee earning a minimum wage of $3.35 per hour to account for Gautreaux's future wage-earning capacity. He then discounted this figure to present value and arrived at a total future wage loss of $261,999.15.[3]

---

**2.** At one point in his testimony, Dr. Goodman indicated that he based his calculations on a leaderman's salary of $11.96 per hour; at another point, he indicated that he used $11.41 per hour for the leaderman's salary.

**3.** Although on cross-examination Dr. Goodman recalculated Gautreaux's future lost wages using

After carefully studying the record, we find that there is no rational basis for this figure. First, the testimony is undisputed that Gautreaux would not have been performing a leaderman's job in the future but that he was soon to be demoted to relief crane operator. It was a definite error to calculate future wage loss based on a leaderman's salary, and we therefore reject this computation.

Second, the record clearly shows that Gautreaux's future wage-earning capacity exceeded minimum wage employment. Both medical experts agreed that by spring 1985, Gautreaux could operate a crane or other heavy equipment such as a forklift or cherry picker. Donna Cheramie, a claims examiner who reviewed accident and medical records for McDermott, testified that the highest salary earned by an offshore crane operator was $10.70 per hour; the lowest wage for an onshore crane operator was $6.63 per hour. This evidence demonstrates that as of spring 1985, Gautreaux's future earning capacity greatly exceeded that of a $3.35 minimum-wage employee. Dr. Goodman failed to account for Gautreaux's true future earning capacity, and his future wage loss calculation of $261,999.15 is therefore wholly inaccurate and cannot be relied upon to support future wage losses.

We have determined thus far that the maximum total amount recoverable by Gautreaux for pain and suffering, past and future lost meals and past lost wages is $211,803.04.[4] The jury awarded total damages of $483,000.00. Subtracting $211,803.04, the maximum amount recoverable for three of the four damage components, from the jury's total award, leaves an amount of $271,196.96 attributable to future lost wages. It is clear to us that this particular figure, which surpasses Dr. Goodman's excessive future wage loss calculation of $261,999.15, is based on an apparent, but inexplicable, miscalculation.

Because we cannot determine Gautreaux's actual earning capacity, we are unable, however, to ascertain from this record the maximum amount that Gautreaux may recover for his future wage loss. We note that although both medical experts testified that Gautreaux could not perform a job that required jumping from barge to barge, heavy manual labor or climbing, there is no evidence in the record to indicate that Gautreaux would have been precluded from operating a crane or other heavy machinery. There is some evidence, although scant, that a relief crane operator not only operates a crane but must also perform some manual tasks. Dr. Landry's testimony suggests that although Gautreaux was able to operate a crane, he was not fit to perform significant additional manual duties. In any event, even if we were to assume that Gautreaux was incapable of working in the future as a relief crane operator, the record indicates that he was able to perform other jobs that paid substantially more than minimum wage. The evidence, however, does not indicate the range of jobs or the wages of those jobs that he could perform. In sum, on the record before us we cannot determine to what extent or in what amount Gautreaux's injury impairs his future earnings. We do know that the evidence will not support the losses for future wages calculated and offered by his witness on economic damages. Thus, our review of the $483,000 verdict leads us to the conclusion that only $212,000, for pain and suffering, total lost meals and past lost wages, can be supported by applying the maximum recovery rule to this record. It therefore follows that the verdict is excessive.

In view of our determination that the general verdict is excessive, we must now consider the proper disposition of this case. Because we are unable to determine the maximum award that the record before us

---

a relief crane operator's salary and arrived at a figure of $191,861.10, this calculation is now irrelevant in view of our disposition of this case.

**4.** This figure is derived as follows:

| | |
|---|---|
| $100,000.00 | (maximum pain and suffering) |
| 72,358.87 | (maximum total lost meals) |
| 39,444.17 | (maximum past lost wages) |
| $211,803.04 | |

will support, and because we are completely unable to determine loss of future earnings, it is apparent that suggestion of a remittitur is inappropriate. It is true that we have been able to determine maximum recovery on all components of the jury's general verdict except future wage loss. When a jury renders a general award that contains numerous components of damages, however, we cannot invade the province of the jury by awarding an amount for each separate component. *De Centeno v. Gulf Fleet Crews, Inc.*, 798 F.2d 138, 142–45 (5th Cir.1986); *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1235 (5th Cir.1986). Because the general verdict conceals the jury's intended breakdown of the damages, the entire award must be called into question and remanded for a new trial.[5]

Therefore, without disturbing the jury's findings on liability or contributory negligence, we vacate the general award and remand for a new trial solely on damages.

AFFIRMED IN PART, VACATED IN PART AND REMANDED.

---

5. We take this opportunity to remind litigants that in cases involving numerous elements of damages, using special interrogatories under Fed.R.Civ.P. 49(a) to return an itemized award rather than a lump sum verdict, is not only helpful to the appellate court but will very likely spare the parties the expense of a new trial on damages. *See In re Air Crash Disaster*, 795 F.2d at 1235–36.